PHILIP SILBERT *v.* STATE OF MARYLAND

[No. 507, September Term, 1969.]

*Decided July 21, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

E. Thomas Maxwell, Jr., for appellant.

John J. Garrity, Assistant Attorney General, with whom were Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City, and Robert C. Ozer, Assistant State's Attorney for Baltimore City, on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The crux of this case is whether there was probable cause for the issuance of the search warrant under the authority of which the police searched the person of Philip Silbert and the automobile driven by him. We find that there was not. Therefore the lower court erred in denying appellant's pretrial motion to suppress the evidence made on that ground. The evidence admitted in error was the basis of appellant's conviction by a jury in the Criminal Court of Baltimore of conspiring with persons whose names were unknown to the Grand Jurors to violate the lottery laws and with possession of lottery records. He was prosecuted for the latter offense as a subsequent offender and found to be such at a court trial separate from the trial of the current offense. He was sentenced to five years on the possession conviction and to one year to run consecutively therewith on the conspiracy conviction. Both judgments are reversed.

We cannot agree with the State that the question of the validity of the warrant was not preserved for appellate review. Maryland Rule 729 is applicable whenever property is claimed in a court to have been obtained by an unlawful search or seizure. Section a. The motion here was filed pursuant to § b 1 and, although the court was not required to determine it before trial commenced as it was not filed at least 5 days prior to the trial date, see § d 1, the court did determine it as a preliminary matter, § d 2. By the provisions of § f, since the motion was denied, appellant's objection to the evidence sought to be suppressed was preserved on a hearing on a motion for a new trial and on appeal "even though no further objection was made to the introduction of such evidence at trial." The State now argues that during the trial appellant not only did not object to the admission of the evidence but specifically said he had no objection. It relies on *Martelly v. State*, 230 Md. 341 which held that the defendant's express waiver of objection at trial to the admission of evidence was "tantamount to a withdrawal of his pre-

vious motion to suppress." We distinguish *Martelly* firstly because it was decided prior to the adoption of Rule 729 and found unnecessary to decide whether a pretrial motion to suppress amounts merely to an objection to the evidence which is waived by a later failure to object to the same evidence. At 347. Rule 729, § f, as we have observed, expressly preserves the question on appeal without further objection at trial. We distinguish *Martelly* secondly because there the question was presented in a different factual posture than here. Unlike *Martelly* we consider that appellant here made clear to the court at trial that it was only "for the trial of the general issue" that he was not raising the issue of the legality of the search warrant. The State was anxious for the jury to read the application for the search warrant and argued that if appellant did not object to the admission of the evidence at trial its challenge to the validity of the warrant was withdrawn and that if it did object to the admission of the evidence, then "the jury gets to see the affidavit * * * to determine whether or not the search was a lawful search." It was in this frame of reference that defense counsel said:

> "Your Honor, respectfully, *for the trial of the general issue here,* we very respectfully did not raise the issue of an illegal search warrant. That was an interrogatory matter before the trial of the general issue, but when we were enticed during the trial of the general issue, we made it perfectly clear on the record during this trial we have no quarrel with the legitimacy and legality of the search * * * We are not raising it *on the trial of the general issue* whatsoever." (emphasis supplied)

At that point appellant obviously and correctly felt that the question of the legality of the warrant was preserved on appeal by the denial of his pretrial motion to suppress. But in the face of the State's positive and repeated assertion that he must either waive challenge to the search

warrant or place it and the application on which it was issued before the jury by objecting to it,[1] he tried to make clear that the issue of the legality of the warrant had been decided against him preliminarily and therefore he was not again raising the point at trial of the general issue as a matter of trial tactics. We cannot say on this record that appellant had changed his mind since the pretrial determination and affirmatively waived all objection to the search and seizure. We find that the question of the validity of the warrant is properly before us.

The warrant stated that the judge issuing it was satisfied that there was probable cause to believe that evidence related to lottery and gambling was concealed on the person of appellant and in "a 1968 Oldsmobile two door sedan, Model Ninety-Eight, gold with black vinyl top, bearing license number FS 7591" driven by him, affidavit having been made by Sgt. Steve Tabeling of the Baltimore City Police Department that the officer had reason to believe that such evidence was so concealed. It commanded that the officer, with the necessary and proper assistants, search appellant and his vehicle and to seize the evidence if found. It was issued 9 April 1969.

It is firmly established in this State that the court's consideration of the showing of probable cause should be confined solely to the affidavit itself. *Tucker v. State,* 244 Md. 488; *Scarborough v. State,* 3 Md. App. 208. The affidavit here was 9 pages long. It may be divided into three parts. The first part, consisting of the first page, sets out affiant-Tabeling's qualifications and his knowledge of the past history of Silbert. Tabeling had been a member of the Baltimore City Police Department for 15 years; he had participated in approximately 60 lottery investigations. He knew that Silbert had been convicted 6 times for lottery offenses, the first in 1944, the last three on 21

---

1. Of course the jury had no function in the determination of the legality of the search warrant and the application for the warrant should not have been placed before them in any event. We so held in *Price v. State,* 7 Md. App. 131, 142-144, decided 3 June 1969. The trial here was on 19 and 20 June 1969. See also *Cleveland v. State,* 8 Md. App. 204.

March 1969. The 1969 convictions were the result of a 5 month investigation conducted by Special Agents of the Intelligence Division of the Internal Revenue Service. Tabeling was familiar with the results of that investigation as disclosed by the testimony adduced at the trials and from it knew that Silbert had the reputation "of a leading lottery principal or backer and has been convicted of participating as one of the backers of a multi-million dollar lottery syndicate." The next 7 pages contain a recounting of the observations of four special agents of the Intelligence Division of Internal Revenue Service—Michael B. Eddy, William A. Rodman, Matthew Kratchwell and Leroy Martinas. The agents are described as being experienced investigators of lottery operations, having "participated in from twelve (12) to one hundred and fifty (150) lottery investigations over a period of from two (2) to six (6) years." The observations were related to Tabeling by Eddy and Rodman. The observations cover 8 days during a period 26 March to 8 April 1969. We summarize them.

26 March—Silbert was seen in the Pimlico Hotel Bar talking on a pay telephone. He left the hotel. About 10 minutes later Jesse Bondroff, who had been convicted on 29 January 1969 "of violation of the lottery laws and of being a co-conspirator with Silbert, both of whom were demonstrated by the testimony in that trial to be backers of a multi-million dollar lottery operation", left the hotel by the same door.

29 March—Silbert left his house, put a small white parcel in a 1968 Oldsmobile, "looked up and down the street furtively and went back in the house." In a recent conspiracy trial of him it was disclosed that he was observed over a 5 month period carrying similar parcels to and from lottery headquarters and his home. A short time later he left his house, drove the car to the vicinity of a laundry on Reisterstown Road, parked and, carrying nothing, proceeded on foot in the direction of the laundry. The surveillance team lost him. About three minutes later he returned to the car, still not carrying anything. He

drove to the parking lot of a cleaning establishment in front of 4401 Towanda Avenue. He got out of the car and the agents lost sight of him. About 3 minutes later he reentered the car and drove to downtown Baltimore via the Jones Falls Expressway. He left the Expressway at St. Paul Street, drove south and turned left on East Baltimore Street. He pulled to the left curb and looked at cars passing from the rear. "This is a device known to your affiant and to the aforesaid Special Agents as a commonly employed stratagem for the purpose of eliminating a 'tail'." The surveillance team could not stop without being observed, drove past and lost him. During the whole period of observation Silbert followed a pattern of driving familiar to affiant and the Special Agents "as the typical driving behavior of individuals who are constantly aware of possible surveillance and anxious to avoid such surveillance"—changing lanes, checking his rear view mirror, driving slower than the normal traffic flow, watching each car that passed him. And each time he entered his car he would first look "carefully" up and down the street.

31 March—Silbert spent the morning in the Criminal Court of Baltimore and the afternoon at Pimlico Race Track.

1 April — Silbert left home in the Oldsmobile about 11:00 A.M., drove to the laundry on Reisterstown Road, entered it, left within 3 minutes, and proceeded in the direction taken on 29 March toward the parking lot on Towanda Avenue. But after driving about one minute from the laundry he pulled to the curb and observed cars passing him from the rear. He entered a pay telephone booth and made a call of about one minute duration. It was disclosed in the recent conspiracy trial of Silbert that during a former five month period of surveillance he engaged almost daily in the frequent receipt and transmission of telephone calls of less than one minute duration. "Affiant and the observing agents believed that this was the relay of lottery information to and from the lottery 'bank' or 'office'." The call completed, Silbert care-

fully observed the traffic "up and down Reisterstown Road", entered his car, drove to Fallstaff Road and the agents lost him. His driving patterns during the period of observation were characterized by the agents as "evasive and devious." He spent the afternoon in the Criminal Court of Baltimore.

2 April — Surveillance was started in the afternoon when Silbert was seen at Pimlico Race Track. At the conclusion of the racing program, he went to the Pimlico Hotel, remained until 6:00 P.M. and then drove home, not engaging "in any of the evasive and devious driving patterns previously described and observed."

3 April—Silbert left home about 11:28 A.M., drove to the laundry, went in, came out in 3 minutes, drove to the 5100 block of Park Heights Avenue, parked and walked out of sight of the agents. He returned to the car in 5 minutes, drove to the Towanda Avenue parking lot and stopped beside a 1965 white Oldsmobile. A negro male was standing between the two cars. In about a minute the negro male got in the white Oldsmobile and it and Silbert's car, which Silbert had not left, drove away. The license plate on the white Oldsmobile was found to be registered to a 1967 Volkswagen. Affiant stated that he and the agents were familiar "with the strategy of switching license plates as a means to avoid identification as a frequent practice of lottery syndicate operators, writers, and pick-up men." Silbert's driving patterns this day were again "evasive and deceptive."

7 April—Silbert left his home by a different route and the agents did not pick him up until the afternoon when he was located at Pimlico Race Track. After the races he went to the Pimlico Hotel and remained until 7:00 P.M. when he went to a restaurant at 1101 N. Calvert Street. On his way to the restaurant he left the main route of traffic frequently, turning "onto several alleys" and then re-entering the main route of traffic.

8 April—Observation was commenced at the Towanda Avenue parking lot. About noon a 1966 white Pontiac Tempest occupied by a colored female parked beside the

lot. In about 15 minutes she pulled in front of the lot, alighted and "paced the area within a few steps" of the car. She was holding "a brown paper bag which appeared to be light in weight and approximately the size and shape of currency." Affiant noted that brown paper bags of this size and shape have been observed by him and the agents "to be commonly used in the operation of the lottery business as the means whereby currency and lottery slips are transferred from location to location." The colored female drove away about 12:40 P.M. While there she "appeared nervous, apprehensive, and watchful." Approximately 5 minutes later a colored male driving a red 1965 Cadillac drove in the parking lot. He appeared to be looking for someone; he pulled away, drove past the lot several times for about 5 minutes and then left.

The third part of the affidavit sets out the beliefs of affiant. It was disclosed at the recent conspiracy trial of Silbert and thus known to affiant that "brief and surreptitious meetings on public parking lots was actually practiced by Silbert's brother * * * and other subordinates of Silbert's organization as part of the operation of the lottery syndicate backed by [Silbert] and Jess Bondroff and was the means whereby lottery paraphernalia was transferred." Therefore affiant believes that Silbert is still engaged in a lottery operation in Baltimore City, that the Towanda Avenue parking lot is used by him as a "drop" (a location where lottery paraphernalia or currency is transferred), and that the "lottery paraphernalia consists of, but is not limited to, currency, adding machine tapes, slips, records, run-down sheets, re-cap sheets, bet slips, records of bets, and record of payments." Affiant noted that Silbert had "never been observed, either during the previously referred to five month period of surveillance or during the investigation from March 26, 1969, to and including April 8, 1969, to be engaged in any legitimate business or occupation."

The lower court found that affiant "had probable cause to believe" that lottery paraphernalia was concealed upon

the person and in the car driven by Silbert. It said, "[T]he visiting of the laundry may be all right and the visiting of a parking lot may be all right, but visiting a parking lot and staying there for just a brief period of time with some degree of regularity, taken together with all of the other circumstances and results of surveillance certainly led me to believe at the time that I read the affidavit that there was probable cause to believe that this automobile was being used for just what the affiant stated."

Unless it can be said, and we do not believe that it can be, that henceforth from appellant's convictions of lottery offenses in 1969 he travelled the streets enveloped in probable cause which was apparent to any officer who had knowledge of the evidence adduced at the trial leading to the 1969 convictions, we think that the facts and circumstances within the knowledge of Tabeling as set out in the affidavit did not establish that the officer had probable cause to believe that appellant had lottery paraphernalia concealed on his person or in the car driven by him. The facts and circumstances were only that on each of two days appellant made a telephone call, once from a hotel and the other time from a pay booth; on one day he was in the vicinity of a parking lot for a short time and on another day he drove on the parking lot beside another car, staying a short time and leaving at the same time as did the other car, which bore license plates not issued to it; on one day he was in the vicinity of a laundry, and on two days he entered the laundry and stayed only a short time; on one day he came from his house and put a small white parcel in his car; on one day in which he was not observed on or in the vicinity of the parking lot, a woman was seen there holding a brown paper bag; she remained about 40 minutes "appearing nervous, apprehensive, and watchful," and then left; about 5 minutes later a man drove by the lot, appeared to be looking for someone he did not find, drove by several more times and left; on several days he used "evasive and devious driving patterns." At no time was appellant observed giving

or receiving any money or what may have been lottery paraphernalia to another person. At no time was any conversation between him and another person overheard, either when face to face or over the telephone, to indicate that he was involved in a lottery operation. Affiant intimated that the small white parcel, contents unknown, appellant placed in his car on one occasion involved a lottery operation because during the investigation leading to the prior convictions he was seen to carry similar packages to and from lottery headquarters and his home. He concluded from his knowledge of lottery operations that the short telephone call appellant was seen to make on one occasion, and not overheard, was "the relay of lottery information to and from the lottery 'bank' or 'office'." He believed, because appellant was seen in the vicinity of the parking lot on one day and on the lot on another day, remaining for only a short time, and because of the activities of an unknown woman and man with respect to the lot on a third day, that appellant used the lot as a location where lottery paraphernalia or money was transferred. He asserted that the pattern of driving practiced by appellant was "the typical driving behavior of individuals who are constantly aware of possible surveillance and anxious to avoid such surveillance." In short he uses his familiarity as to how lottery operations are conducted and his knowledge of appellant's past activities as the Rosetta stone to translate the observations of appellant's current and, on the surface, innocuous activities into conduct showing a full blown lottery operation. We believe that *Spinelli v. United States,* 393 U. S. 410, does not permit this translation of the observations here set out.

William Spinelli was convicted under a United States statute of travelling to St. Louis, Missouri, from a nearby Illinois suburb with the intention of conducting gambling activities proscribed by Missouri law. He challenged the constitutionality of the warrant which authorized the FBI search that uncovered the evidence necessary for his conviction. The affidavit detailed Spinelli's movements on

five days as observed by the FBI. On four of the days he crossed one of two bridges leading from Illinois into St. Louis, Missouri between 11:00 A.M. and 12:15 P.M. and parked his car between 3:00 P.M. and 4:45 P.M. in a lot used by residents of an apartment house. On one day he was followed further and seen to enter a particular apartment. The FBI determined that the apartment contained two phones carrying numbers WYdown 4-0029 and WYdown 4-0136 listed in the name of a woman. The affiant asserted that Spinelli was known to him and to federal law enforcement agents "as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers." The affidavit stated that the FBI "has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers and disseminating wagering information by means of the telephones" in the apartment he was seen to enter. The Supreme Court concluded that the informant's tip was not sufficient to provide the basis for probable cause —not that it was so unsubstantial that it could not properly have counted in the issuing judge's determination, but it needed some further support. The Court said, at 418-419:

> "When we look to the other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed. As we have already seen, the allegations detailing the FBI's surveillance of Spinelli and its investigation of the telephone company records contain no suggestion of criminal conduct when taken by themselves—and they are not endowed with an aura of suspicion by virtue of the informer's tip. Nor do we find that the FBI's reports take on a sinister color when read in light of common knowledge that bookmaking is often carried on over the telephone and from premises ostensibly used by others for perfectly normal purposes.

> Such an argument would carry weight in a situation in which the premises contain an unusual number of telephones or abnormal activity is observed, cf. *McCray v. Illinois,* 386 U. S. 300, 302, 87 S. Ct. 1056, 1057, 18 L.Ed.2d 62 (1967), but it does not fit this case where neither of these factors is present. All that remains to be considered is the flat statement that Spinelli was 'known' to the FBI and others as a gambler. But just as a simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause, we do not believe it may be used to give additional weight to allegations that would otherwise be insufficient."

In the instant case the affidavit does not suggest that the police had received information from an informant that Silbert was engaged in lottery activities since his convictions on 21 March 1969. The allegations detailing the agents surveillance of Silbert from 26 March to 8 April 1969 are not sufficient when taken by themselves to suggest the operation of a lottery and they are not endowed with the aura of suspicion by virtue of affiant's knowledge that Silbert had previously conducted a lottery operation. As was said in *Spinelli* above quoted, "[W]e do not believe that it may be used to give additional weight to allegations that would otherwise be insufficient." Nor can we find that the agents' observations take on a sinister color even when read in the light of affiant's knowledge of the usual way in which the lottery business is conducted. That is to say, we feel that the issuing judge could not properly determine from the four corners of the affidavit that a prudent and cautious man would be justified in believing that there was more than a suspicion or possibility that lottery violations were being committed by Silbert, even giving consideration to the special significance which objects, happenings and individuals may have conveyed to the trained, experienced and knowledgeable police officer who applied for the warrant. See *Hall v. State,* 5 Md. App. 394, 396-398. The affidavit was full

of sound and fury, but if it signified something, it was not that there was probable cause to believe Philip (Pacey) Silbert during the period 26 March to 8 April 1969 was concealing lottery paraphernalia on his person or in the described automobile in violation of the laws of Maryland. In holding that the warrant here falls short of constitutional standards we quote further from *Spinelli*:

> "[W]e do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. *Beck v. Ohio*, 379 U. S. 89, 96, 85 S. Ct. 223, 228, 13 L.Ed.2d 142 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois*, 386 U. S. 300, 311, 87 S. Ct. 1056, 1062 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca*, 380 U. S. 102, 108, 85 S. Ct. 741, 745 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States*, 362 U. S. 257, 270-271, 80 S. Ct. 725, 735-736 (1960). But we cannot sustain this warrant without diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and citizenry."

We do not reach the other questions presented.

> *Judgments reversed; case remanded for a new trial; costs to be paid by the mayor and city council of Baltimore.*