JOHN SHIRLEY BAUCKMAN, ARTHUR T.
FRIEDMAN AND WILLIAM KENNETH
ROGERS *v.* STATE OF MARYLAND

[No. 475, September Term, 1969.]

*Decided July 2, 1970.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*William H. Adkins, II, George J. Goldsborough, Jr.,* and *David B. Lamb* for appellants.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *John C. North, II, State's Attorney for Talbot County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant Bauckman, Friedman, and Rogers were convicted on April 22, 1969 at a court trial in the Circuit

614

Court for Talbot County of the felony of unlawfully possessing marihuana.[1] Bauckman and Rogers were each sentenced to six months' imprisonment; Friedman, a second offender, received a three-year term. The principal contention on appeal from these judgments is that the trial court erred in overruling appellants' motions to suppress the incriminating evidence seized at the time of their warrantless arrests, it being claimed that the arrests were unlawful as not having been made on probable cause to believe that they had committed a felony.

The record discloses that at approximately 4:30 p.m. on January 25, 1969 the appellants were together in an automobile momentarily stopped at a traffic signal when they were arrested by Troopers of the Maryland State Police Department and Agents of the F.B.I. A search of the vehicle uncovered a quantity of marihuana in the glove compartment. A small pipe and thimble was found on the floor of the car which, upon analysis, contained traces of marihuana. Three packets of marihuana were seized from Bauckman's person, together with some notations written on a paper napkin tending to indicate an intention to make a sale of the drug for profit. From Friedman's person the officers seized a chemical formula for DMT, a hallucinogenic drug.

The information upon which the police acted in arresting appellants was supplied by a youthful nouveau informer, Larry Kenton, who was with appellants in the vehicle when the arrests were made. The record shows that Kenton's participation as a police informer was an outgrowth of his relationship with Reverend John Trojan, Jr., a minister in whom he confided. As a result of information imparted by Kenton to Reverend Trojan, he introduced Kenton to Sergeant Emil Myers of the State Po-

---

1. By Chapter 237 of the Acts of 1970, effective April 15, 1970, the unlawful possession of marihuana is designated a misdemeanor. The Act specifies that its provisions shall apply to judgments not final on its effective date; hence, the offense for which appellants stand convicted now is a misdemeanor. *See Oberlin v. State*, 9 Md. App. 426.

lice. It was upon information supplied by Kenton to Myers that the arrests were made.

In contending that the arrests were not based upon probable cause, appellants assert that the reliability of Kenton was not demonstrated; that, on the contrary, the record discloses that he was a particularly unreliable person because he had a lengthy juvenile record; that he had used marihuana; that he had been placed under psychiatric treatment; that he was a source of constant woe to his widowed mother; that he was markedly hostile to his peers (the appellants); that he was a severe disciplinary problem in school and was expelled from one school; that he had impregnated a teenage girl; that he was once arrested for unlawful possession of alcoholic beverages, tried to escape, and when caught, lied to the police about his name; and that in December of 1968 the Circuit Court for Talbot County received an unsatisfactory report at a violation of probation hearing, and this resulted in a further requirement of psychiatric treatment. Appellants further contend that Kenton had never previously supplied information to the police and that consequently there was no basis upon which to assess the reliability of his information. They also claim that there was no sufficient independent corroboration of Kenton's information upon which to find the existence of probable cause.

The arguments now advanced by appellants were raised below on the motion to suppress. The trial judge, Harry E. Clark, in holding the arrests lawful, gave detailed reasons to support his conclusion. With commendable thoroughness, he said: "Putting myself in the chair of the reasonable and prudent man in order to determine whether or not there was probable or reasonable cause for making these arrests without a warrant, I must first determine the credibility of Larry Kenton, the informant. In determining this it has been urged upon me that he is not reliable for a number of reasons, first that he has a rather significant juvenile record as being a delinquent child, and that on one occasion he lied to the police concerning his identity when he was questioned concerning

616

the illicit possession of alcoholic beverages. Although he does have a long and somewhat checkered career as a juvenile delinquent, of which this Court is well aware, it should be noted that only on one occasion was he ever found to have broken the criminal law and that occasion being when he was found to be unlawfully in possession of intoxicating beverages. The other matters that have brought him to the Juvenile Court's attention were chiefly the outgrowth of his inability to establish a satisfactory relationship with his mother after his father died, which eventually resulted in him being sent to the Hershey School, from which he was subsequently expelled because he had gotten a girl pregnant. Thereafter he was brought to the Court's attention on two occasions for his lack of progress in school, brought about to a certain extent by being truant therefrom, and his running quarrel with his mother which came close to developing to the point of physical violence.

"The Court was quite impressed with the testimony of Reverend Trojan, who apparently has been the only person that has been able to establish any rapport with this rather rebellious juvenile. According to his testimony he got so close to him as to actually be considered an intimate friend and adviser to whom Kenton freely admitted his shortcomings and his past use of marijuana and finally confided in him that he was quite upset and disturbed over the fate of a young lady he was very much interested in from Denton, who had blown her mind due to her addiction to hard line narcotics. According to Reverend Trojan this seemed to be the event in his life that had changed his whole attitude and had persuaded him to give up his drug habit and to try to do something to stop the drug traffic that was creeping up in this County. In fact, he told the Reverend that he would be more than willing to cooperate with him and the police in any way he could to help stop this illicit traffic. The Reverend, who has had some considerable experience as a minister of the gospel and, therefore, in dealing with fallen people, came to the conclusion after a number of long confer-

ences that this boy was sincere in his desire to reform himself and to try to do something for the good of society. After he had assured himself of Kenton's integrity and credibility, he got in touch with Sergeant Myers of the Maryland State Police and told him that he had a person that was willing and in a position to help him break up the narcotic traffic in this County. This resulted in conferences between Kenton, Trojan and Myers of between one and two hours duration on January 17th, 1969, at which time Sergeant Myers testified that he was assured by the Reverend Trojan that this boy was completely trustworthy and truthful and sincere in his desire to help stop the drug traffic in this County. Kenton also told Myers, gave him a list of the persons in the County who he knew to be addicted to narcotics and those who were purveyors thereof. Sergeant Myers, who had had some experience with the narcotic situation in this County, found that the information that Kenton gave him corresponded with information he had received from a number of other sources. He also perceived from this first conference with Kenton that he was quite knowledgeable concerning narcotics and the jargon of persons that deal in it and use it. Being convinced that Kenton was reliable and trustworthy, he set up another conference with Kenton and the Reverend Trojan for the 24th of January, at which conference were two federal narcotics agents, and there a plan was evolved for the purchase (sic) [purpose] of catching several students at Kirkland Hall College who were planning to go to Washington on Saturday, January 25th, to purchase a kilo of marijuana. At this conference, which lasted some length of time, Kenton was able to relate that he would be able to accompany these boys on their trip to Washington for the purpose of purchasing the narcotics if he could contribute $225.00 to the purchase thereof, and that he was going to be picked up in the neighborhood of eight a.m. on the morning of the 25th at the Talbottown Shopping Center. Thereupon Sergeant Myers made the money available to Kenton on the afternoon of the 24th and it was

planned that if the purchase was made in Washington that Kenton would attempt to get in touch with the police in order to advise them if a purchase had been made, that no signal would be given, but that if the purchase was not made, he would throw some object from the vehicle. Sergeant Myers, to reenforce his conviction that he was dealing with a trustworthy person, drove to the Talbottown Shopping Center at seven thirty that Saturday morning. He observed Kenton appear at the appointed spot at that place at about the appointed time. A few minutes thereafter a red sedan with three young men in it approached and picked Kenton up, one of whom, by the name of Bauckman, he was able to later identify as one of the three in the car that were arrested around three o'clock or rather, around 4:45 that afternoon. Roughly around three o'clock in the afternoon Myers received a call from somewhere in the Washington area from Kenton advising that they had been to one place and had been unsuccessful in making a purchase of narcotics but had been assured that they could get it at another place, to which some of the boys had already gone to make the buy and that they should shortly be leaving for the eastern shore. Thereafter, around four o'clock, he received a radio call from a State Trooper stationed at the eastern end of the William Preston Lane Bridge that the car in question had passed over the bridge heading eastward for the eastern shore. Soon thereafter Myers, in an unmarked car with one of the federal narcotics agents, saw the car pass in the vicinity of the Trailways bus station near Queenstown. He testified that he immediately drove his car to the rear of the car in which Kenton was riding and followed at a safe distance, while another car containing other narcotics agents proceeded ahead of the Kenton car. He testified that he clearly saw Kenton in the back of this automobile and was able to observe him when they reached the place appointed for him to give a signal if need be, to wit: at the intersection of Route 213 and U. S. Route 50. He testified that no signal was given so, therefore, he knew that the buy had been made, so

they proceeded to accompany the car until they reached the intersection of Route 33 with the Easton by-pass, at which point the car had to stop for a red light. At that point the officers got out of the two cars, one in front of the Kenton car and one to the rear, and approached the Kenton car and made the arrests and searched the persons of these three defendants and the automobile, finding on the defendant, Bauckman, several packages of marijuana and a large package of marijuana in the glove compartment of the automobile which was driven and owned by Rogers.

"Now the Court feels that the manner in which this plan was set up was perfectly intelligent under the circumstances and that it indeed would have been very nasty for Kenton to have, by any overt act, given a signal that the buy had been made. This was fraught with all of the objections advanced by the defendants concerning his inability to make a signal, as well as the fact that it might cause these three defendants to suspect that something amiss was afoot, in which case not only would Kenton's safety have been endangered but also the evidence could have been destroyed before the arrests could have been made.

"We feel that the fact that Kenton was on probation and the fact that the last time he appeared in Court he was advised that if he had any more difficulty he was going to be sent away, that he indeed would have been most foolhardy to have lied to the police, made suckers of them. Furthermore, it took a certain amount of courage to be willing to participate in such an endeavor where at any time he could be found out or suspected and dealt with severely by those he was trying to assist the police in apprehending, so his willingness to assist the police by taking an active part in the investigation where he knew he couldn't keep his identity concealed is inconsistent with the role of a liar. The fact that he lied on one occasion to the police when he was caught red-handed may be ascribed to the panic that young people usually become subject to under such circumstances, but it must be remem-

bered that in this case he had no obligation to help the police, no obligation to give them any information, no obligation to do anything for the police, nor is there any evidence to show that he expected any reward for his aid to the police, so we feel that under these circumstances, Sergeant Myers, who knew he was on probation and who had found that everything that he had told him concerning what was going to happen and concerning who were users and purveyors of narcotics was true or in accordance with information he had previously received. The fact that he did not seek out the police but that this meeting was arranged through a minister of the gospel would make a reasonable and prudent man feel that Kenton was credible and trustworthy, and that had these circumstances been related to the theoretical prudent and reasonable man, we believe that he would have felt that the arrests were made with probable cause and are, therefore, legal, and that the searches made of the defendants' persons and the defendant, Rogers' automobile, were within the scope of searches permitted as an incident to a legal arrest, therefore we overrule the motion to suppress."

It is, of course, the function of the trial court to determine for itself the persuasiveness of the facts relied upon by the police to establish probable cause for a warrantless felony arrest. *Beck v. Ohio,* 379 U. S. 89; *Edwardsen v. State,* 231 Md. 332; *Bolesta v. State,* 9 Md. App. 408. Only the probability and not a *prima facie* showing of criminal activity is the standard of probable cause. *Spinelli v. United States,* 391 U. S. 933; *Cornish v. State,* 6 Md. App. 167. Whether a warrantless felony arrest is constitutionally valid necessarily turns upon whether, at the moment the arrest was made, the police had probable cause to make it, *i.e.,* whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing a felony. *McCray v. Illinois,* 386 U. S. 300; *Draper*

*v. United States,* 358 U. S. 307; *Farrow v. State,* 233 Md. 526; *Simms v. State,* 4 Md. App. 160. And where, as here, the arrest is initiated on hearsay information received from an informant, the State to establish its legality where challenged should sufficiently inform the trial judge of some of the underlying circumstances from which the informant concluded that a crime was about to be, was being, or had been committed by the person to be arrested, and some of the underlying circumstances from which the police concluded that the informant was credible or his information reliable. *Spinelli v. United States, supra; Oberlin v. State, supra; Mullaney v. State,* 5 Md. App. 248.

We have carefully reviewed the record and find that Judge Clark's opinion—rendered with full appreciation of the relevant and applicable constitutional principles—was supported by the evidence. Judge Clark was fully cognizant of Kenton's somewhat unsavory past and he plainly took it into consideration in assessing the reliability of his information. While Kenton's overall reliability and/or stability as a member of the community, based on past performance, was anything but good, the key consideration was whether the police could, under all the circumstances, reasonably believe that his information concerning this particular transaction was credible. That Judge Clark concluded that the arrests were based on probable cause in the constitutional sense is, we think, clearly correct.

Appellant Rogers contends that he was denied the effective assistance of counsel in that he was represented by counsel who simultaneously represented his two codefendants at the trial where there was an actual or imminently potential conflict of interest.[2] Rogers, who made no such complaint during the trial, now claims such a conflict of interest to have existed in these four particulars:

(1) That trial counsel did not call Kenton as

2. Two lawyers were jointly retained by the three defendants to represent them at the trial.

a witness at the hearing on the motion to suppress.

(2) That trial counsel did not demand a jury trial in a situation where the codefendants were charged with joint possession of the same evidence.

(3) That trial counsel failed to demand a hearing to determine whether the statement given to the police by Rogers was voluntary.

(4) That trial counsel recognized the actual conflict of interest by withdrawing their appearance prior to sentencing.

In support of each of these areas of alleged conflict of interest, appellant Rogers weaves an intricate (though highly speculative) set of arguments. But we see no need to set them forth. The law is well settled that mere representation of two or more defendants at the same trial by one lawyer does not of itself establish a conflict of interest. *McCoy v. Warden*, 234 Md. 616; *Hess v. State*, 4 Md. App. 508. We are satisfied from our review of the record that the defense of appellant Rogers was in no real manner diverse or in conflict with that of his codefendants. Trial counsel were faced with the stark reality of a situation where the three defendants had been found in a motor vehicle containing narcotics under circumstances, and against an evidentiary background, from which joint possession would likely be inferred. It was in their common interest to attack the legality of their arrests in an effort to suppress from evidence the incriminating narcotics and, hopefully, their confessions. (*see Davis v. Mississippi*, 394 U. S. 721). That trial counsel, at the time of sentencing, suggested the existence of a conflict of interest between the defendants in the sentencing process, was based on the fact, as they stated, that "the degree of participation in the offense * * * differs as to each of the individuals" and therefore "what we said on behalf of one might be detrimental to another one, and possibly it is our duty to say something detri-

mental against one in favor of another and again conflict with the duty to each * * *." Counsel stated to the court at that time that there had been "no conflict of interest as between them [the defendants] on the question of guilt or innocence" since "[t]hey would all be guilty or acquitted on the precise same questions of law."

We conclude that there was no conflict of interest as claimed by Rogers within the settled precepts of law governing the determination of that question. *See Glasser v. United States*, 315 U. S. 60; *Pressley v. State*, 220 Md. 558; *Davenport v. State*, 7 Md. App. 89.

Each appellant next contends that his conviction for unlawful possession of marihuana must be reversed because the law under which he was convicted (Maryland Code, Article 27, Section 277) was repealed during the pendency of his appeal by Chapter 237 of the Acts of 1970 (see footnote 1). The same contention was raised in *Oberlin v. State, supra,* and found to be without merit. It was the purpose of Chapter 237 to change the criminal sanctions for the crime of unlawfully possessing marihuana by reclassifying the offense from a felony to a misdemeanor and generally reducing the penalties therefor.[3] As the provisions of the Act apply to judgments not final on its effective date—and thus are applicable to appellants' cases—it is clear that Friedman's sentence of three years must be vacated since the new Act provides a maximum term of imprisonment of two years for second offenders. While the six-month terms imposed on Rogers and Bauckman, both first offenders, were within the maximum of one year permitted by Chapter 237, we deem it advisable under the circumstances of this case to vacate their sentences and remand for resentencing under the new Act. By so concluding, we obviously do not mean to imply that

3. That appellants' arrest was found legal under the rule permitting warrantless arrests based upon probable cause to believe that a felony had been committed, and not upon the more stringent test applicable to misdemeanor offenses, *viz.*, that such an arrest is authorized only if the misdemeanor is committed in the officer's presence, does not entitle appellants to a new trial. *See Denikos v. State,* 9 Md. App. 603.

the six-month sentences were too severe; our only purpose is to permit the trial judge to consider the provisions of the new law in imposing sentence on Rogers and Bauckman, in relation to the sentence to be imposed on Friedman.[4]

> *Judgments affirmed, except as to the sentences; sentences vacated; case remanded for imposition of sentences under Chapter 237 of the Acts of 1970. Appellants to pay costs.*

---

4. In view of the remand, we do not consider Rogers's contention that he was denied the assistance of counsel at sentencing; nor do we consider the contention of Bauckman and Friedman that they were denied due process of law when the trial judge imposed sentence partly on the basis of information neither included in the record nor obtained from the appellants, and which they were not permitted to discredit or refute.