DONALD LEE DAWSON AND FRANCES M. DAWSON, a/k/a FRANCIS M. DAWSON *v.* STATE OF MARYLAND

[No. 485, September Term, 1970.]

*Decided April 30, 1971.*

696

The cause was argued before MURPHY, C.J., and MOY-LAN and POWERS, JJ.

*Robert C. Heeney* for appellants.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, State's Attorney for Prince George's County,* and *Edmond B. O'Connell, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, Donald Lee Dawson and Frances M. Dawson, husband and wife, were convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge Samuel J. DeBlasis, of unlawfully maintaining a premises for the purpose of selling lottery tickets in violation of Article 27, Section 360, of the Annotated Code of Maryland. The appellant Donald Lee Dawson was also convicted of unlawfully betting, wagering or gambling on the results of horse races in violation of Article 27, Section 240.

On this appeal, they raise three contentions:

(1) That the search warrant for their home was issued and executed without adequate probable cause having been shown to justify its issuance;

(2) That the trial court committed error in refusing to require the State to reveal the name of the confidential

informant mentioned in the application for the search warrant; and

(3) That the evidence was legally insufficient to justify the convictions of either of the appellants.

The first contention requires us to consider whether the application for the search warrant revealed probable cause for the issuing magistrate to believe that illegal gambling activities were being conducted at the appellants' home at 8103 Legation Road in Hyattsville. The affidavit offered in support of the application for the search warrant contained both the direct observation of Detective John M. Fyfe and hearsay information furnished to Detective Fyfe by a confidential source.

### The Dual Analysis of Probable Cause

The existence of probable cause to justify the issuance of either a search and seizure warrant or an arrest warrant [1] may be predicated upon either or both of two broad categories of information—1) the direct observation of the affiant applying for the warrant (or of the affiants on supporting affidavits, see *Price v. State*, 7 Md. App. 131; *Scott v. State*, 4 Md. App. 482), or 2) hearsay information furnished to the affiant by someone else and then recited by the affiant in his affidavit. It is axiomatic that probable cause may be based upon the direct observation of the affiant himself. *Buckner v. State*, 11 Md. App. 55, 61; *Hall v. State*, 5 Md. App. 394, 396. It is equally well-established that probable cause may be based upon hearsay information alone and need not reflect the direct personal observation of the affiant. *Jones v. United States*, 362 U. S. 257; *Aguilar v. Texas*, 378 U. S. 108, 114; *Scott v. State*, 1 Md. App. 481; *Grimm v. State*, 6 Md. App. 321, 326. It follows that probable cause may also be based upon a combination of direct observation and hearsay information. *Aguilar, supra; Spinelli v. United States*,

---

1. That the quantum of required probable cause is the same to justify the issuance of a search and seizure warrant or an arrest warrant is well-established. *Giordenello v. United States*, 357 U. S. 480, 485-486; *Aguilar v. Texas*, 378 U. S. 108, 112 n. 3.

393 U. S. 410; *Frankis v. State,* 11 Md. App. 534; *Lashley v. State,* 10 Md. App. 136; *Iannone v. State,* 10 Md. App. 81.

Confusion somehow manages to creep into the cases, however, where the affidavit offered to support probable cause is based upon the mixed predicate of both direct observation and hearsay information. That confusion is engendered by the failure to grasp the unifying principle —to appreciate that both of the broad categories of information are evaluated by the same general standards of measurement. The apparent difference in the standards is simply one of surface application and not of theoretical significance.

Whether the information being evaluated is the direct observation of the affiant or is hearsay information, the issuing magistrate is required to perform the same intellectual surgery. In determining the existence *vel non* of probable cause, the magistrate must make two distinct determinations. The number and the nature of these determinations do not vary, whether the specimen being analyzed is direct observation or hearsay information. He must:

(1) Evaluate the truthfulness of the source of the information; and

(2) Evaluate the adequacy of the factual premises furnished by that source to support the validity of the source's conclusion.

In the first instance, he is judging the integrity of a person. In the second instance, he is judging the logic of a proposition. These functions are distinct. They are the direct analogues of those other two functions performed by the ultimate finder of fact who 1) assesses the credibility of a witness and 2) then assesses the weight to be given the testimony of that witness.

In evaluating the truthfulness of the source of the information, the magistrate is presented with no problem in dealing with the affiant-observer. "The oath affirms the honesty of the statement and negatives the lie or imagination." *Spinelli,* at 423 (concurring opinion by White,

J.). The oath, as a trustworthiness device, establishes, *per se,* the credibility of the affiant-source and, thereby, the reliability of his directly observed information. Where the source of the information, however, is an absent, non-swearing declarant (an informant), the pathway to the establishment of that source's credibility is more circuitous. The issuing magistrate must have, as a substitute for the oath, some other reason to be persuaded of the credibility of the source of the information.

In deciding whether he is so persuaded, the magistrate must perform the same analysis whether the non-swearing source is named or unnamed. *Spinelli,* at 424 (concurring opinion by White, J.) ; *Kist v. State,* 4 Md. App. 282, 285. His evaluation, in theory, will be the same in either case. The practical distinction is that in dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself), under the facts of a particular case, to establish the credibility of that source or the reliability of his information. *Kapler v. State,* 194 Md. 580; *Ward v. State,* 9 Md. App. 583, 591-592; *Grimm v. State,* 6 Md. App. 321, 328. See also *Taylor v. State,* 238 Md. 424; *Jones v. State,* 242 Md. 95; *Knight v. State,* 7 Md. App. 282 (although these cases involve probable cause for warrantless arrests based upon hearsay information, the principle involved as to the trustworthiness of a witness-informant would also apply to cases involving applications for warrants). Compare *Kist v. State, supra.*

Where the source of the information is unnamed, however, the method of persuading the magistrate is more involved. He must be furnished sufficient background information for him to judge for himself the credibility of the unnamed source and/or the reliability of that source's information. *Spinelli,* at 416; *Iannone v. State, supra; Grimm v. State,* 6 Md. App. 321. The credibility of the person and the reliability of the information are but alternative aspects of the same trustworthiness phenomenon. To conclude that trustworthiness is probably pres-

ent, the magistrate must be convinced either 1) that the source himself, as a person, is inherently honest and credible, see *Sessoms v. State,* 3 Md. App. 293, 295-296, or 2) in the absence of such proof of character of the man, that the information is furnished by that source under circumstances redolent with insurances of trustworthiness. *Spinelli,* at 425 (concurring opinion by White, J.). See also *Buckner v. State, supra.* Credibility and reliability may operate alternatively or in combination to establish probable trustworthiness.

In evaluating the credibility of different types of sources, the practical applications may vary, but the common denominator of all such decisions is that the issuing magistrate must have before him enough circumstances to be able to judge for himself the honesty of the source of the information, whether that source be an affiant, a named non-swearing informant or an unnamed non-swearing informant. The magistrate may no more accept an affiant's assertion that his source (named or unnamed) is credible in lieu of a recitation of facts from which the magistrate may draw that conclusion for himself than he may accept an affiant's assertion that the affiant himself is credible as a substitute for the affiant's taking of the oath. *Spinelli,* at 424 (concurring opinion by White, J.) ; *Gatewood v. State,* 244 Md. 609 ; *Grimm v. State,* 7 Md. App. 491, 494-495. The concluding, in either case, is only for the magistrate.

Once the magistrate has decided that the information is trustworthy, he has still only half completed his ultimate determination. He must still decide what the information is worth. He has decided that the source is not lying; but he has not yet decided whether the source is mistaken. The magistrate's second function is now to evaluate the information which he is accepting as true and to see what probabilities emerge from that available data. Again, he may not accept the conclusion of either the affiant-observer or the non-swearing informant.[2] He

---

2. As was stated by Mr. Justice Jackson in *Johnson v. United States,* 333 U. S. 10, at 13-14:
"The point of the Fourth Amendment, which often is not

must take from either of those sources his facts and then arrive at his own conclusion as to the significance of those facts. *Spinelli*, at 416; *Buckner v. State, supra*, at 62; *Hall v. State, supra*, at 397.

In the case of the affiant-observer, the magistrate cannot accept the affiant's mere conclusion that "A probably committed a crime" or that "B probably contains contraband." The magistrate needs to know what the observations were so that he can conclude for himself whether that observed data persuades him that "A probably committed a crime" or that "B probably contains contraband." *Nathanson v. United States*, 290 U. S. 41; *Jones v. United States, supra*, at 269; *Whiteley v. Warden*, U. S. , 91 S. Ct. 1031, 28 L.Ed.2d 306; *Grimm v. State*, 7 Md. App. 491, 493-494; *Scott v. State*, 4 Md. App. 482, 491. By the same logic, the magistrate may not accept the non-sworn hearsay conclusion of even a credible informant any more than he may accept the sworn conclusion of a credible affiant-observer. *United States v. Ventresca*, 380 U. S. 102, 108-109; *Frey v. State*, 3 Md. App. 38, 45-46. Again, he needs to know just what the informant saw and just what the informant heard to warrant the informant's conclusion.[3] *Price v. State, supra,*

---

grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

See also *Aguilar*, at 111; *Giordenello v. United States, supra*, at 486.

3. If the informant himself is offering not direct observation but hearsay twice compounded, the entire evaluation process must begin again at a second level of remoteness. The primary informant must then pass along sufficient data in sufficient detail so that the magistrate may again judge for himself 1) the credibility of the secondary informant and 2) the worth of that secondary informant's information. If, in some extreme hypothetical situation, the secondary informant should be a mere conduit for hearsay thrice compounded from a tertiary informant, the evaluation process is escalated to yet another level of remoteness and so on ad infinitum. *Spinelli*, at 416 (majority opinion by Harlan, J.) and 423-425 (concurring opinion by White, J.). Ultimately, the magistrate must have the benefit of someone's first-hand observation in order to evaluate the worth of the information and must have also satis-

at 140. At issue here is not the informant's credibility but the informant's thinking process—not his integrity but his ratiocination. See *Owings v. State,* 8 Md. App. 572, 576-578.

In applying then these tools of analysis to an application based upon a mixed predicate of direct observation and hearsay information, the issuing magistrate may, after evaluating both the trustworthiness of the source of the information and the weight and worth of the information itself, reach one of four conclusions:

(1) That the direct observation is adequate unto itself to establish probable cause; see *Shrout v. State,* 238 Md. 170; *Gatewood v. State, supra; Nutt v. State,* 9 Md. App. 501, 505;

(2) That the hearsay information is adequate unto itself to establish probable cause; *Ward v. State, supra; Sessoms v. State, supra;*

(3) That neither the direct observation nor the hearsay information, standing alone, is adequate to establish probable cause but that the two combined do add up to the establishment of such probable cause; *Frankis v. State, supra; Buckner v. State, supra; Iannone v. State, supra; Lashley v. State, supra; Price v. State, supra; Frey v. State, supra;* or

(4) That even the sum total of the direct observation plus the hearsay information does not establish probable cause. *Spinelli, supra; Grimm v. State,* 7 Md. App. 491.

The most logical procedure to follow in evaluating a warrant application (and that suggested by *Spinelli,* at 415-416) is to look first at the hearsay information. If the

factory proof of the credibility of every person involved in the chain of transmission of the information from the initial observer to the magistrate himself. See *Kapler v. State, supra,* for an instance of hearsay twice compounded. Although involving probable cause for warrantless arrests, the cases of *Bolesta v. State,* 9 Md. App. 408, 412-416, and *Mullaney v. State,* 5 Md. App. 248, 252-256, contain excellent discussions of the problems involved when hearsay is twice compounded and when "credibility/reliability" must be shown not simply for the conduit-informant but for the ultimate observer-informant, as well. See also *People v. Horowitz,* 233 N.E.2d 453 (N. Y. Ct. App.) ; *People v. Holup,* 289 N.Y.S.2d 19; *People v. Moore,* 296 N.Y.S.2d 276.

affiant has furnished the issuing magistrate enough of the underlying circumstances to persuade the magistrate 1) that the informant is credible or his information otherwise reliable and 2) that the informant's conclusion was validly arrived at, probable cause is established. *Aguilar*, at 114. What *Spinelli*, at 413, refers to as "*Aguilar's* two-pronged test" has been met. If, on the other hand, the information furnished about the informant and the information furnished from the informant fail to pass muster by either or both of *Aguilar's* prongs, the informant's information is still not rendered valueless. "Rather, it need[s] some further support." *Spinelli*, at 418.

In search of that "further support," the magistrate may then look to the direct observation recounted by the affiant. That direct observation may serve a dual function. As substance in its own right, it bears directly on the question of probable cause. It may also serve the ancillary and concomitant function of corroborating or verifying the hearsay information. Initially, the trustworthiness of an informant's information may not have been adequately established intrinsically because either 1) the magistrate was not persuaded that the informant was, by proven past performance (see *McCray v. Illinois*, 386 U. S. 300, at 303-304; *Frankis v. State, supra; Owings v. State, supra; Green v. State*, 8 Md. App. 352; *Watkins v. State*, 7 Md. App. 151; *Cornish and Gilman v. State*, 6 Md. App. 167; *Rollins v. State*, 5 Md. App. 495; *Hundley v. State*, 3 Md. App. 402)[4] or testimonials as to character (see *Sessoms v. State, supra*, and *Bauckman v. State*, 9 Md. App. 612) or otherwise, inherently credible or 2) the magistrate was not persuaded that the information was otherwise reliable by virtue of having been furnished under circumstances reasonably insuring trustworthiness. *Spinelli*, at 425 (concurring opinion by White, J.) ; *Bauckman v. State, supra*, at 619; *Price v. State, supra*, at 141. The necessary trustworthiness may then be estab-

4. Although the Maryland cases here cited involved probable cause for warrantless arrests, the rule as to an informant's credibility in the constitutional sense is not dissimilar to that in the case of a warrant application.

lished extrinsically by the independent verification of the affiant's direct observation. If some of the significant details of the informant's story are shown to be, in fact, true, that encourages the magistrate to believe that all of the story is probably true. The Supreme Court outlined this procedure in *Spinelli*, at 415:

> "The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar*, the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

See also *Buckner v. State, supra,* at 66; *Iannone v. State, supra,* at 85; *Price v. State, supra,* at 138.

### The Warrant in This Case

The substance of the affidavit of Detective Fyfe in support of the application for the search and seizure warrant consists of nine paragraphs. The first paragraph lists the investigative experience of Detective Fyfe and ends with his conclusion that gambling activities are being conducted at the suspected premises. Paragraphs three through nine contain the direct observations of Detective Fyfe himself. Only the second paragraph deals with the hearsay information. That paragraph contains not simply Detective Fyfe's description of the confidential informant but also the information furnished to Detective Fyfe by the confidential informant. The paragraph recites:

> "That on Thursday April 17, 1969 your affiant interviewed a confidential source of informa-

tion who has given reliable information in the past relating to illegal gambling activities which has resulted in the arrest and conviction of persons arrested for illegal gambling activities and that the source is personally known to your affiant. That this source related that there was illegal gambling activities taking place at 8103 Legation Road, Hyattsville Prince George's County, Maryland by a one Donald Lee Dawson. That the source further related that the source would call telephone #577-5197 and place horse and number bets with Donald Lee Dawson."

A moment's analysis reveals that the first sentence relates to the "credibility/reliability" prong of the *Aguilar* test and that the second and third sentences relate to the "conclusionary validity" prong of the *Aguilar* test.

In looking at the "conclusionary validity" prong first, *Aguilar* is satisfied by the recitation in this case. It is clear that the confidential informant is not passing on mere hearsay or idle rumor that he has picked up from some secondary source. He has related that he has personally called telephone number 577-5197 and has personally placed horse and number bets with the appellant. His knowledge is first hand. His facts support his conclusion. With respect to meeting this prong of the *Aguilar* test, the hearsay recitation in the case at bar is diametrically contrary to that found to be inadequate in *Spinelli,* at 416:

"Perhaps even more important is the fact that *Aguilar's* other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not told how the FBI's source received his information—*it is not alleged that the informant personally* observed Spinelli at work or that he had *ever placed a bet with him.* [Emphasis supplied] Moreover, if

the informant came by the information indirectly, he did not explain why his sources were reliable. Cf. *Jaben v. United States,* 381 U. S. 214 (1965). In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

The information furnished by the affiant about his confidential source is more borderline, however, in meeting the "credibility/reliability" prong of the *Aguilar* test. In that the recitation includes the assertion that the informant's information in the past has resulted in the "conviction of persons arrested for illegal gambling activities," the circumstances go further to establish credibility than they did in *Spinelli,* wherein the confidential source was simply described as "a confidential reliable informant," with no further recitation cataloging any results flowing from that source's information, even in vague, general terms. In asserting that both arrests and convictions have resulted from the source's information on past occasions, the underlying circumstances here furnished are stronger than those furnished in *Iannone v. State, supra,* wherein we held at 85:

"We think it clear that an undisclosed informant's reliability [credibility] is not established by the affiant's mere unsupported and unparticularized conclusory assertion that he has 'furnished information which has proven to be reliable in the past'."

See also *Lashley v. State, supra,* at 140. But see *Draper v. United States,* 358 U. S. 307, at 313. It may well be that the facts here recited are enough to establish the credibility of the informant. In view of the strong independent

verification hereinafter to be discussed, however, it is unnecessary for the State to rely exclusively on such recitation.

Even were we to assume, arguendo, that the trustworthiness of the confidential information has not been directly established because 1) the circumstances furnished to support the informant's credibility have been not quite adequate and 2) no circumstances have been furnished to show that the information is otherwise reliable, we must now explore the third avenue to trustworthiness. We must look to the direct observations of the affiant and see whether enough verification of parts of the informant's story exists to foster the conclusion that the whole story is probably true. Our analysis of the direct observations leads us to conclude that ample verification does exist; that the confidential information is sufficiently corroborated to be as trustworthy as that information would need to be to "pass *Aguilar's* tests without independent corroboration." *Spinelli,* at 415. In looking at "the other parts of the application," we find ample allegations "which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed." *Spinelli,* at 418.

A discreet surveillance was conducted on the appellant's movements for six consecutive working days — Friday, April 18, 1969, through Thursday, April 24, 1969, excluding only the intervening Sunday. The pattern of conduct that emerged strongly suggested that the appellant was a middle-echelon executive in the gambling business—a business that can conveniently accommodate both bets on the horses and bets on the day's winning number, since both wagering activities are geared to the same hourly schedule and both look to the same sporting events for the winning and losing results.

The appellant urges strongly that not one of his observed activities could not easily have been engaged in by an innocent man. That is true. It is also beside the point. What the appellant ignores is that probable cause emerges not from any single constituent activity but,

rather, from the overall pattern of activities. Each fragment of conduct may communicate nothing of significance, but the broad mosaic portrays a great deal. The whole may, indeed, be greater than the sum of its parts.

In the gambling business particularly, with its sophisticated pyramidal structure, only the lower-level operatives—the street writers—are vulnerable to surveillance that may yield directly-observed illicit transactions. The management level of the gambling syndicate is generally isolated from compromising contact with the better. Even at the management level, however, each echelon of command has its own tell-tale pattern of activity. The patterns are distinct. One does not expect the backer, the layoff man or the office manager—except when he is careless—to carry brown paper bags or to engage in overheard conversation about a three digit number, anymore than one expects the president of a bank to stand at a teller's cage. The office manager does not behave as does the pick-up man; the backer does not behave as does the writer. If the law, in its wisdom, were not to realize this —that different levels of the pyramid display different behavioral characteristics—it would be condemning law enforcement to the frustrating and never-ending futility of merely annoying the syndicate by reeling in occasionally its little fish — the low-level attrition that is little more than a license to do business to multi-million-dollar-a-year underworld cartels.

The affiant ascertained that the appellant, less than three years before the current observations, had been arrested and convicted of gambling violations. In interpreting otherwise ambiguous conduct, a man's history of criminal activity may well be of probative force. Although, as we observed in *Silbert v. State,* 10 Md. App. 56, 65, a convicted gambler does not forever after walk through life "enveloped in probable cause," he, nevertheless, is burdened by a history that does at least lend interpetative color to otherwise ambiguous activity. See *Gatewood v. State, supra,* at 616; *Shrout v. State, supra,* at 174.

The appellant seeks to equate the sworn fact of his criminal conviction for gambling in the present affidavit with the assertion condemned in *Spinelli,* at 418-419, that Spinelli was "known" to the affiant there as a "bookmaker." The appellant misreads *Spinelli.* The fact that a man is "known" as a gambler could be highly relevant where a proper factual foundation is laid for either the affiant's or the informant's conclusion. What was there condemned was not the probative force and relevance of a suspect being a known gambler, but simply the bald conclusory assertion of that fact with no factual basis furnished to the magistrate in support of the assertion. The court there said:

> "All that remains to be considered is the flat statement that Spinelli was 'known' to the FBI and others as a gambler. But just as a simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause, we do not believe it may be used to give additional weight to allegations that would otherwise be insufficient."

The unsubstantiated assertion in *Spinelli* is, therefore, in no way analogous to the sworn recitation of the appellant's criminal record in the case at bar.

The appellant—an able-bodied adult male — was observed over portions of two work weeks to be engaged in no apparent legitimate employment. There are, of course, possible innocent hypotheses to explain this. There is also the hypothesis that there was no time for other employment because the gambling business is a full-time job that permits of little or no moonlighting in the legitimate sector. The appellant's history is a relevant factor in weighing the conflicting hypotheses which might account for this, otherwise unexplained, occupational inactivity in mid-April.

The affiant ascertained that the appellant had two telephones in his residence — not two instruments but two separate lines. This is not at all unusual. Neither, how-

ever, is it the norm. The affiant also ascertained that both of those telephone lines had silent listings. This is not highly unusual; it is, nevertheless, unusual. There are again, of course, possible innocent hypotheses. In weighing the hypotheses, however, the circumstances surrounding the telephones are not to be viewed in a vacuum. When the normal telephonic capacity of a house is doubled, when steps are taken both to cloak the phones at least partially in secrecy and to keep unwanted callers off the lines, and when a man who has been convicted of gambling in the past and is currently manifesting no means of legitimate livelihood is at home in close proximity to those phones during the busy hours of a bookmaking operation — an operation carried on in large measure by telephone—a pattern begins to emerge.

Another factor was added to the equation when the affiant observed that one of the appellant's silent listings —577-5197—was picked up in the course of a September, 1966, raid on a lottery operation in College Park. It is axiomatic that different outposts of a gambling operation need to know how to establish communication with each other.

On each day of observation, the appellant was observed to purchase an Armstrong Scratch Sheet, which gives information about horses running at various tracks that day. The purchase of an Armstrong Scratch Sheet is not, of itself, illegal. It, nevertheless, reveals to the prudent and reasonable mind that the purchaser has some interest in horseraces. That interest, of course, might be simply that of a better. It might, on the other hand, be that of a receiver or transmitter of bets. In weighing the relative probabilities, the reasonable mind cannot ignore the number and the privacy of the appellant's telephones, the time when the appellant is near those telephones, the appellant's criminal history and the appellant's apparent lack of legitimate employment.

On each morning of observation, the appellant was observed to leave his house between 9:02 and 10:20—to wit, at 9:02, 10:00, 10:20, 9:30, 10:00 and 9:30, respectively.

On each day of observation, the appellant was observed to return to his house between 11:20 a.m. and 12:06 p.m. —to wit, at 11:50, 11:20, 11:53, 12:06, 11:55 and 11:48, respectively. On each day of observation, the appellant was observed, once he had returned to his house, to remain steadfastly in that house until after 6 p.m. The affiant, whose experience and expertise in gambling investigations was amply set out in the first paragraph of the affidavit, averred that the hours between noon and 6 p.m. are those when horse and number bets can be placed and when the results of the betting become available.

On each day of observation, the appellant was observed, during his morning rounds, to stop at a number of places, including liquor stores and restaurants, for periods of no more than several minutes in duration. Except for the Armstrong Scratch Sheets, he was never observed to purchase anything from any of the stores he visited. He was never observed to eat or drink anything at any of the restaurants he visited. The conduct of the appellant on these regular morning rounds is not viewed by the prudent and reasonable mind in a vacuum, but, rather, in meaningful conjunction with all of the other known data about him recounted in the application. The brevity and the frequency of the stops and the methodical regularity of the daily regimen are classic characteristics of the pick-up man phase of a gambling operation. He picks up the "action" (money and/or lists of bets) from the previous day or evening from pre-arranged locations—"drops." At the same time, he delivers cash to the appropriate locations for the pay-off of yesterday's successful players.

On one of the days of observation, the appellant was observed in close association during all of the day's activities—both upon the morning rounds and in the appellant's house throughout the afternoon—with a William Abdo, who was known by the affiant to have been arrested in 1966 along with the appellant for alleged gambling violations. It is not to permit "guilt by association" to

reason that one's association may, at least, lend interpretative color to otherwise ambiguous activity.

In reviewing the observations, the ultimate question for the magistrate must be What is revealed by the whole pattern of activity? In the case at bar, the various strands of observation, insubstantial unto themselves, together weave a strong web of probable guilt.

The appellant seeks to equate the independent verification in this case to that in *Spinelli*. The two situations could not be in greater contrast. On five days, Spinelli was observed to drive across a Mississippi bridge from Illinois to St. Louis, Missouri, at between 11 a.m. and 12:15 p.m. On four occasions, Spinelli was observed to arrive at a parking lot near a suspected premises at between 3:30 p.m. and 4:45 p.m. No account at all was given of his activities in the St. Louis area during the approximate four-hour interval between crossing the bridge and arriving at the parking lot. On one occasion, Spinelli was observed to enter the apartment listed to a Grace Hagen. As in the instant case, two telephones were in the Hagen apartment. Unlike the instant case, the telephones were not unlisted. In *Spinelli,* there were no observations placing Spinelli in close proximity to the telephones throughout the rush-hour period of a bookmaking operation.

In *Spinelli,* unlike the case at bar, there were no observations of the "pick-up man"-type of activity, whatsoever. In *Spinelli,* unlike the case at bar, there was no observed association with a previously arrested gambler. In *Spinelli,* unlike the case at bar, there was no daily purchase of an Armstrong Scratch Sheet to evidence some daily interest in horseraces. In *Spinelli,* unlike the case at bar, neither Spinelli's telephone number nor Grace Hagen's telephone number had been picked up in a raided gambling headquarters. In *Spinelli,* unlike the case at bar, Spinelli was not a convicted gambler. The affiant's conclusion there that he was a "known" gambler failed to merit consideration because of the absence of any factual basis for that conclusion.

Finally, the confidential hearsay information in *Spinelli* was so inadequate, under *Aguilar,* as to lend no interpretative color to the direct observations. In contrast, the confidential hearsay information was very substantial and would lend significant interpretative color to the direct observations here, if any further interpretative color, indeed, were needed. The hearsay information may, of course, reinforce the direct observation just as the direct observation may reinforce the hearsay information. There is no one-way street from direct observation to hearsay information. Rather, each may simultaneously cross-fertilize and enrich the other.

The direct observation in the case at bar may well be adequate unto itself to establish probable cause for the issuance of the search warrant. It is unnecessary to decide that question, however, since the direct observation amply verified the already significant confidential hearsay information and boosted it above *Aguilar's* threshold. The trustworthiness of the informant's assertion that he placed racing bets with the appellant [5] over one of the unlisted telephone numbers—577-5197—was clearly extrinsically established. That the combination then of 1) the verified hearsay information and 2) the direct observation, as substance in its own right, served to establish probable cause is patent.

The appellants' second assignment of error is without merit. In the course of the trial, the appellants objected when the State, through Detective Fyfe, offered into evidence certain items seized from the appellants' house. The jury was excused and a hearing was conducted on the existence *vel non* of probable cause. In addition to reviewing the application for the search warrant, the trial judge permitted appellants' counsel to question Detective Fyfe. He asked Detective Fyfe what arrests had resulted from the informant's information furnished on past occasions. The State objected and the objection was sustained. Appellants' counsel then asked the name of the in-

---

5. Throughout the discussion on probable cause, the word "appellant" has referred to the appellant Donald Lee Dawson.

formant. Again the State objected, and again the objection was sustained. The appellants now complain that they should have been permitted to test the affiant's allegation that there was a confidential informant by quizzing him as to the use made of information received on prior occasions. In going as far as it did, the court gave the appellants more than that to which they were entitled.

The law has long been firmly settled that the court's consideration of the showing of probable cause will be confined solely to the four corners of the affidavit itself. As the Court of Appeals stated in *Smith v. State*, 191 Md. 329, at 335:

> "The better rule seems to be that the court's consideration of the showing of probable cause should be confined solely to the affidavit itself, and the truth of the alleged grounds stated in the affidavit cannot be controverted, as was done in the instant cases, by receiving the testimony of the accused and other witnesses. *Ray v. State*, 1929, 43 Okl. Cr. 1, 276 P. 785; *Commonwealth v. Thacker*, 1929, 229 Ky. 488, 17 S.W.2d 399; *Piper v. State*, 1931, 116 Tex. Cr. R. 378, 34 S.W.2d 283; *Cornelius on Search and Seizure*, Sections 169 and 170, *supra*. This rule would not, of course, prevent the accused from showing, for instance, that the affiant did not in fact swear to the affidavit as recited therein. Although the Federal rule is not before us here it is doubtful, in spite of the statement in *Cornelius on Search and Seizure, supra*, that the few Federal cases on the exact point hold that in determining probable cause, the truth of the alleged grounds can be controverted. Specifically, the existence of probable cause cannot be negatived by the mere denial by the accused of the facts sworn to. *United States v. Nagle*, D. C., 34 F. 2d 952. We are of opinion that any

inquiry as to whether the affidavit, on which the search warrant was based, showed probable cause is confined to the affidavit alone and testimony should not be taken to controvert the truth of the allegations therein."

This Court dealt with a similar contention in *Sessoms v. State, supra,* at 296-297. We there said:

"The appellant also attacks the warrant on the ground that in the affiant's testimony at the trial, he said that the informant told him that 'she had seen certain weapons in the appellant's apartment' but when the informant testified, she said that 'the only knowledge she had about any weapons was what she had overheard in a conversation.' While such inconsistency may go to the credibility of the witnesses, a matter to be considered by the trier of facts, it is not relevant to the issue of probable cause for the issuance of the search warrant. It has been firmly established in this State that 'the court's consideration of the showing of probable cause should be confined solely to the affidavit itself.' *Smith v. State,* 191 Md. 329, cert. den., 336 U. S. 925. In *Scarborough v. State,* 3 Md. App. 208, we said that evidence outside the affidavit, no matter by whom produced or how, is not relevant to the inquiry of probable cause."

See also *Tucker v. State,* 244 Md. 488; *Scarborough v. State,* 3 Md. App. 208; *Hall v. State, supra,* at 397; *Grimm v. State,* 6 Md. App. 321, 326; and *Grimm v. State,* 7 Md. App. 491.

"If false affidavits are made, of course, the persons making them are liable to criminal prosecution." *Smith v. State, supra,* at 339. To render him liable to the possible sanction of perjury is the very purpose of requiring the affiant to take the oath.

The appellants' final contention is that the evidence

was legally insufficient to permit the charges against them to go to the jury. We feel otherwise.

Detective Fyfe and Detective John Rossi arrived at the appellants' home to execute the search warrant at 5 p.m. on April 24, 1969, a day the earlier part of which had figured in the final observation contained in the application for the warrant. Frances Dawson answered the door. Upon seeing the policemen, she turned back toward the interior of the house and called, "Donald". At that point, the officers smashed the storm door, entered the house and charged up the stairs. Frances Dawson had already joined Donald Dawson on the second floor. The toilet was flushing and Detective Fyfe observed a milky-type water being flushed away.

In the upstairs bedroom where the appellants were found was also found an adding machine. Two telephones were found in a small office just off the bedroom and adjacent to the bathroom. Each telephone had a separate number. Beside the telephones were found two pads of water-soluble paper—the so-called "jelly paper" which can cause written evidence to disappear instantaneously in a few drops of water just as its companion device, "flash paper," can cause written evidence to disappear instantaneously in a puff of smoke. There was also found an intercom device on that floor, as well as assorted Armstrong Scratch Sheets for the week. Also recovered was approximately $3600 in U. S. currency.

Between 5 p.m. and 5:30 p.m., approximately 15 calls came in on the two upstairs telephones. Detective Rossi answered the phones. At least several of the callers attempted to place bets on various races, one at Suffolk Downs and another at Garden State Park. At least two callers made inquiry about the day's "number."

The appellants attempt to distinguish between the culpability of husband Donald Dawson and wife Frances Dawson, alleging that the conduct of Frances Dawson amounted to no more than innocent presence in her husband's house. *Propst v. State*, 5 Md. App. 36, is disposi-

tive of the contention in quite the contrary direction. We there held, at 44:

> "The appellants May contend finally the evidence was insufficient to convict them for knowingly permitting their apartment to be used for gambling purposes. This contention causes us no problem as to Ruth Virginia May. The property searched was her residence. She was actually present in an adjoining room at the time of the raids which disclosed that a large gambling operation was being conducted there daily. She can not be heard to say that she did not know that the operation was being conducted."

We think there was clearly admissible information to show directly, or circumstantially, or to support a rational inference of the appellants' guilt from which the jury could fairly be convinced beyond a reasonable doubt. *Williams v. State,* 5 Md. App. 450, 459; *Metz v. State,* 9 Md. App. 15, 23.

*Judgments affirmed.*