581 A.2d 19

STATE of Maryland

v.

Jennifer Ann AMERMAN.

STATE of Maryland

v.

Quentin David MADDOX.

Nos. 715, 716, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 30, 1990.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellant.

Michael D. Steinhardt (Forman & Steinhardt, P.A., on the brief), Glen Burnie, for Jennifer Ann Amerman.

Keith Krissoff (Krohn & Krissoff, P.A., on the brief), Annapolis, for Quentin David Maddox.

Argued before MOYLAN, ROSALYN B. BELL and KARWACKI, JJ.

MOYLAN, Judge.

## The Theme

■ The controlling principle dictating this reversal of a suppression order is that when a judge, either at a pretrial suppression hearing or at trial, sits in review of another judge's earlier determination that probable cause existed to issue a search and seizure warrant (or an arrest warrant), the reviewing judge sits in an appellate-like capacity with all of the attendant appellate constraints. Although he may ordinarily be accustomed to assessing probable cause as a matter of fact, he is in this less characteristic role called upon to assess it as a matter of law. The issue is no longer the familiar one of whether probable cause exists; that has already been determined by someone else. The distinct issue, at the reviewing level, is whether that earlier decision now being reviewed was or was not legally in error.

Probable cause does not suddenly spring to life at some fixed point along the probability continuum. It may arise at any number of points within a band of not insignificant width. Within that range of legitimate possibilities, the determination is as much an art form as a mathematical exercise and relies necessarily upon the eye of the beholder. One judge may give a circumstance great weight; another may give it slight weight; each is entitled to weigh for himself and neither will be legally wrong in so doing. Within proper limits, one judge may choose to draw a reasonable inference; another may as readily decline the inference; each will be correct and each is entitled, therefore, to the endorsement of a reviewing colleague. A permitted inference, after all, is not a compelled inference.[1]

---

1. Even undisputed facts may be assessed and evaluated by different judicial fact finders in legitimately different ways. We spoke of this in *Danz v. Schafer*, 47 Md.App. 51, 57–58, 422 A.2d 1 (1980):

Under the circumstances, it is perfectly logical and not at all unexpected that a suppression hearing judge might say, "I myself would not find probable cause from these circumstances; but that is immaterial. I cannot say that the warrant-issuing judge who did find probable cause from them lacked a substantial basis to do so; and that is material." There is a Voltairean echo, "I may disagree with what you decide but I will defend with my ruling your right to decide it." [2]

In referring to a closely analogous constraint on appellate review, we analyzed in *Danz v. Schafer*, 47 Md.App. at 59, 422 A.2d 1, the critical distinction between 1) *de novo* fact finding and 2) reviewing the fact finding of the trial judge. Because the evidence in that case had been undisputed, we were urged to subject it to our own *de novo* fact finding.

---

"The facts that were agreed upon were sufficiently ambiguous to permit a reasonable mind to infer that there had been a perfected gift. By the same token, such an inference would be permitted but would not be compelled. A reasonable mind might also decline to draw such inference. It is to resolve just such ambiguities that we have fact finders, be they judges or be they jurors. Either to infer a loan or to infer a gift would fall within the legitimate range of fact-finding prerogative. What we three appellate judges might infer from the same undisputed facts, were we the fact finders, is beside the point. To choose one resolution of the ambiguity from within a range of legitimate resolutions would not be an error on the part of the fact-finding trial judge, whether we would have made the same choice or not."

2. The same discipline could, indeed, constrain a suppression hearing judge even when reviewing his own earlier issuance of a warrant, *Trussell v. State*, 67 Md.App. 23, 25–29, 506 A.2d 255 (1986), *cert. denied*, 306 Md. 514, 510 A.2d 260 (1986). "Although I would not, as a matter of fact, find probable cause from these circumstances today, I cannot say, as a matter of law, that I was legally in error when I did so yesterday. I, therefore, have no choice at this juncture and in this more confining capacity but to uphold my earlier warrant, although I am frank to admit that I would not reissue it."

This, of course, is a totally different phenomenon from that of reconsidering at trial an earlier pretrial suppression ruling. A reconsideration, unlike a review, determines the issue afresh, just as if the earlier determination had never been made. It often resolves an issue of fact and not an issue of law. Reconsidering a decision and reviewing a decision are totally disparate functions.

We declined to do so, except hypothetically, and pointed out how very different the result can be when employing the more restrained standard of review:

"This Court has considered such an interesting, albeit unusual, possibility. We have put our heads together as fact finders and agreed that if we were looking *de novo* at the undisputed but ambiguous factual predicate here, we would give greater significance than did Judge DeWaters to the events that occurred after September 30, 1974. On the basis largely of that hindsight, we would infer that the original intent of Mrs. Winters had been to make a loan. Let it be unmistakably clear, however, that this does not remotely suggest that we think Judge DeWaters was wrong, let alone clearly wrong. It is no more the case that he is wrong and we are right than that we are wrong and he is right. The very nature of the fact-finding process is such that there is a range for divergent but equally legitimate conclusions, none of which [is] wrong. We cannot say, as a matter of law, that our finding of an intention to make a loan is compelled by clear and decisive evidence that permits no other conclusion. We simply aver that in a close case that could reasonably tilt either way, our personal and idiosyncratic tilt is in one direction. We would defend vigorously, however, the legitimate prerogative of others reasonably to tilt in a different direction." (Footnote omitted).

### The Case

On January 16, 1990, Judge Eugene M. Lerner, in the Circuit Court for Anne Arundel County, issued a search warrant 1) for 290 Cape St. John Road, 2) for a specifically described 1981 Mercedes owned by Quentin Maddox and 3) for a specifically described 1987 Nissan truck also owned by Quentin Maddox. The warrant was executed on January 18. The police recovered 19 bags of marijuana weighing 12 pounds, slightly in excess of $8,000 from three separate locations, other smaller quantities of marijuana and hashish, a triple-beam balance scale, tally sheets, notebooks and

receipts, a large number of pipes and other smoking devices for controlled dangerous substances, and two separate telephone answering machines with tapes. They arrested and indicted Quentin Maddox and Jennifer Amerman, both of whom were present in the house at the time of the search.

After they had been indicted, both Maddox and Amerman, the appellees in these two appeals now consolidated for consideration, moved pretrial to suppress the evidence. The suppression hearing judge in the Circuit Court for Anne Arundel County granted their motions. The State has taken an immediate appeal from these pretrial suppression orders under the provisions of Md.Cts. & Jud.Proc.Code Ann. § 12–302(c)(3) (1989).

The suppression hearing took place in two stages. Initially, the hearing judge read the warrant application that had been submitted to Judge Lerner. After entertaining argument by counsel, he ruled that the application did not establish probable cause for the issuance of the warrant.

In the second stage of the hearing, the State sought to ward off suppression on the ground that the officers, by obtaining the warrant, thereby qualified for the "good faith" exception. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), *rehearing denied,* 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). On that issue, testimony was taken from Detective John Brown, who had been the affiant and applicant for the warrant.[3] The hearing judge also ruled against the State on the issue of good faith.

---

**3.** Although it would make no difference to the outcome of this appeal if it were considered, a decent respect for precision and proper compartmentalization in appellate thinking requires us to point out that none of the testimony taken during the second stage of the suppression hearing will be considered by us. That second stage did not involve the validity of the warrant *per se,* which is all that concerns us on this appeal. That phase of the suppression hearing assumed that the warrant was bad, based upon the earlier ruling, and considered the very different, follow-up issue of whether the police

Because of our belief that there was no flaw in the warrant in the first instance, the State's alternative contention dealing with good faith is moot.

### The Standard of Review

The hearing judge's ruling on the warrant covered a page and a half of transcript, and we will examine its reasoning item by item. It did not articulate the standard of review being employed and therein probably lies its fatal flaw. Although implicit rather than explicit, it is apparent that the suppression hearing judge undertook a *de novo* assessment of the probable cause. Instead of examining whether Judge Lerner had operated within the bounds of his legitimate discretion in issuing the warrant, the hearing judge was looking at the warrant application itself as if of first impression. It is important at the outset, therefore, to state the appropriate standard of review when either a trial court or an appellate court scrutinizes some other judge's decision to issue a warrant.

Whatever lingering doubt may have existed prior to 1983 about the standard of review to be applied to a magistrate's determination to issue a warrant, that doubt was resolved

---

had nonetheless operated in good faith in relying upon it. During that stage, there was extensive testimony from Detective Brown.

In issuing the warrant, Judge Lerner had before him, of course, only the warrant application. During the first stage of the suppression hearing, the judge read the application and made his determination, quite properly, upon that limited data and that alone. In reviewing, in our turn, that review by the suppression hearing judge, we are similarly limited to the "four corners of the affidavit." *Smith v. State,* 191 Md. 329, 335, 62 A.2d 287 (1948); *cert. denied,* 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1087 (1949); *Hignut v. State,* 17 Md.App. 399, 407–408, 303 A.2d 173 (1973).

Frequently, a trial record may reveal information on a subject that is developed at a later time such as the trial itself or, in this case, a subsequent stage of the suppression hearing. For purposes of reviewing an earlier decision (assuming it was not subsequently reconsidered in light of the fuller data), the reviewing court must treat the later information as nonexistent. *Valdez v. State,* 300 Md. 160, 168–169, 476 A.2d 1162 (1984); *Trusty v. State,* 308 Md. 658, 670–672, 521 A.2d 749 (1987).

by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), *rehearing denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983). Consistently and repeatedly, the object of the review was stated to be *the magistrate's decision.* In appealing the magistrate's decision, reviewing courts at all levels were admonished to remember that:

> "Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "

462 U.S. at 231, 103 S.Ct. at 2328. The practical and nontechnical nature of probable cause was reconfirmed, at 462 U.S. at 231–232, 103 S.Ct. at 2328–2329:

> "Our observation in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690 [695], 66 L.Ed.2d 621 (1981), regarding 'particularized suspicion,' is also applicable to the probable-cause standard:
>
> > 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' "

The Supreme Court concluded its examination of the nature of probable cause, at 462 U.S. at 232, 103 S.Ct. at 2329:

> "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."

The *Illinois v. Gates* command was then clear that reviewing courts shall not presume to assess probable cause *de novo* but shall instead extend "great deference" to the prior determination of the magistrate on that issue:

"[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'"

462 U.S. at 236, 103 S.Ct. at 2331. The Court spelled out respectively 1) "the task of the issuing magistrate" and 2) "the duty of a reviewing court":

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."

462 U.S. at 238–239, 103 S.Ct. at 2332.

The Supreme Court went on to explain that one of the strong reasons for extending "great deference" to the magistrate's decision to issue a warrant is to encourage the police to submit to the warrant process:

"'A grudging or negative attitude by reviewing courts toward warrants,' [*U.S. v.*] *Ventresca*, 380 U.S. [102] at 108 [85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; 'courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.' *Id.*, at 109 [85 S.Ct. at 746].

If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some

other exception to the Warrant Clause that might develop at the time of the search." (Citation omitted).

462 U.S. at 236, 103 S.Ct. at 2331. By way of supporting this same preference for the warrant, *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), had admonished reviewing courts to "call the close plays" in favor of the magistrate's decision to issue the warrant:

"Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."

380 U.S. at 109, 85 S.Ct. at 746.

The acid test, according to *Illinois v. Gates,* is not whether the reviewing court would find probable cause but whether the magistrate had a substantial basis for doing so:

"Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that *so long as the magistrate had a 'substantial basis for ... conclud[ing]'* that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." (Emphasis supplied).

462 U.S. at 236, 103 S.Ct. at 2331.

One year later in *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court upbraided[4] the Supreme Judicial Court of Massachusetts for having been too demanding in its scrutiny of the magistrate's decision. It reiterated what *Illinois v. Gates* had said about the appropriate standard of review, making it very clear that finding a substantial basis for what the magistrate did is something less than finding the existence

---

**4.** "We think that the Supreme Judicial Court of Massachusetts misunderstood our decision in *Gates.* We did not merely refine or qualify the 'two-pronged test.' We rejected it...." 466 U.S. at 732, 104 S.Ct. at 2087.

of probable cause, observing at 466 U.S. at 728, 104 S.Ct. at 2085:

> "We also emphasized that the task of a reviewing court *is not* to conduct a *de novo* determination of probable-cause, *but only* to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." (Emphasis supplied).

The *Upton* Court restressed the significant conceptual difference between the two standards, at 466 U.S. at 732–733, 104 S.Ct. at 2088:

> "The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause, the court conducted a *de novo* probable-cause determination. We rejected just such after-the-fact, *de novo* scrutiny in *Gates.*"

In *Potts v. State,* 300 Md. 567, 479 A.2d 1335 (1984), the Court of Appeals, speaking through Chief Judge Murphy, explicitly adopted the Supreme Court's holdings as to the appropriate standard of review. "After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review." 300 Md. at 572, 479 A.2d 1335. It concluded, at 300 Md. at 575, 479 A.2d 1335.

> "Under the totality of the circumstances analysis explicated by *Gates* and *Upton,* and giving the magistrate's determination the great deference mandated by those cases, we hold that there was a substantial basis upon which the magistrate could have found that a search of Potts' residence would uncover illegal narcotics; hence, the issuance of the warrant did not violate the Fourth Amendment."

In *Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488 (1989), the Court of Appeals, again speaking through Chief Judge Murphy, emphatically reconfirmed this deferential

standard for reviewing a magistrate's probable cause determination:

> "Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant.... Moreover, we generally pay great deference to a magistrate's determination of probable cause." (Citation omitted).

*See also Malcolm v. State,* 314 Md. 221, 229, 550 A.2d 670 (1988) ("[T]he defendant must overcome the presumption of regularity attending a search warrant."); *Thompson v. State,* 62 Md.App. 190, 206–207, 488 A.2d 995 (1985).

The "substantial basis" standard is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact finding in a trial setting. Although in that setting an appellate court may not, of course, determine credibility or weigh evidence for itself, it does nonetheless insist that there be some credible evidence which, if believed, could establish each and every distinct element of an offense. *Williams v. State,* 5 Md. App. 450, 247 A.2d 731 (1968); *Metz v. State,* 9 Md.App. 15, 262 A.2d 331 (1970). In a jury trial, the judge, as a legal referee, must subject the evidence to this test of legal sufficiency—this requirement of a *prima facie* case—before passing the question to the jury. In the bench trial, the judge must, in effect, subject the evidence to the same test before passing the question from the left hemisphere of his brain (where he functions as a legal referee) to the right hemisphere of his brain (where he functions as a lay fact finder with subconscious feelings and nonverbal senses intermingling with logic in his final verdict). If that final verdict is not supported by such a *prima facie* or legally sufficient case, it is, by definition, clearly erroneous. *Williams v. State, supra; Metz v. State, supra.* The fact-finding judge is, in short, held to the standard of a legal technician.

It is not so with the warrant-issuing magistrate. "The judge's task is 'simply to make a practical, common-sense decision' whether probable cause exists." *Birchead v. State, supra,* 317 Md. at 701, 566 A.2d 488, quoting *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. " '[T]he quanta . . . of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant." *Illinois v. Gates,* 462 U.S. at 235, 103 S.Ct. at 2330. The magistrates themselves are admonished to remember that the supporting affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca,* 380 U.S. at 108, 85 S.Ct. at 746. *Illinois v. Gates* reminded us, 462 U.S. at 235–236, 103 S.Ct. at 2330, that the warrant-issuing magistrates themselves need not be legally trained, that search warrants "long have been issued by persons who are neither lawyers nor judges" and that "warrants are—quite properly . . .—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings."

Thus, while the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be proved—to wit, that a *prima facie* case be established—*Illinois v. Gates* rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another. *Illinois v. Gates* expressly stated, 462 U.S. at 235, 103 S.Ct. at 2330, that a legally sufficient or *prima facie* showing is not required:

"[I]t is clear that 'only the probability, *and not a prima facie showing,* of criminal activity is the standard of probable cause.' " (Emphasis supplied).

Using then this deferential standard of review, we turn to the search warrant application at hand.

## The Staleness of Probable Cause

Although there was a wealth of additional material in the warrant application, the heart of the probable cause showing was the informant's allegation that he had been purchasing a half-pound of marijuana at a time from Quentin Maddox on a regular, semi-weekly basis. The appellees strenuously argue that the information furnished to Detective Brown by the informant as to these semi-weekly purchases was fatally stale because it contained "no information as to the time frame of the alleged drug deals." Indeed, the critical flaw that the suppression hearing judge found in the warrant application was the failure of the confidential informant to pinpoint with greater precision the dates on which he made purchases of narcotics from Quentin Maddox:

"I just have serious problems with, first of all, the fact that there is no delineation of time in which this confidential source of information allegedly dealt directly with Mr. Maddox.

... [T]he meetings would usually take place on shopping center parking lots or at convenience stores. The source stated, 'Maddox would arrive either in an '81 Mercedes or '87 Nissan truck.'

When? I mean, this is where you need to know what time period you're talking about. And the sale of half pounds, it mentions that.

Then it goes back into all the stuff with James Todd Hibler that obviously those purchases were back before November 2nd when Mr. Hibler was arrested. But when? How much longer—farther before November 2nd?"

The appellees' argument relies on *Connelly v. State*, 82 Md.App. 358, 364–365, 571 A.2d 881, 884 (1990), *cert. granted*, 320 Md. 505, 578 A.2d 778 (1990). *Connelly*, on its facts, is not at all apposite to the factual predicate for the warrant in this case. In *Connelly*, an informant gave information "[s]ometime in February of 1988" implicating Connelly "in an illegal gambling operation." 82 Md.App. at

360, 571 A.2d 881. The warrant was not applied for until November 17, 1988, nine months later. The only police activity triggered by the informant's tip was surveillance "conducted over the *next* 'several' months." *Id.* (Emphasis supplied). As we pointed out, at 82 Md.App. at 363–364, 571 A.2d 881:

> "The surveillance could have occurred during the 'several months' of February, March and April, in which case six months would have elapsed between the last surveillance date and the time of the application for the search warrant. There was no discussion in the affidavit regarding whether the individuals under surveillance were involved in a continuing enterprise."

In agreeing with the suppression hearing judge's ruling that the probable cause was stale, Judge Rosalyn Bell noted, at 82 Md.App. at 365, 571 A.2d 881:

> "There is no indication in the affidavit what police investigative activity, if any, occurred between the original surveillance operation, which supposedly began in February, and the application made nine months later in November of 1988."

In our case, there is no such time lapse. The informant was fully debriefed by Detective Brown on December 15, 1989. The search warrant was issued on January 16, 1990, one month later. During the intervening month, the police conducted extensive additional investigation, which served the dual purpose of 1) adding directly to the accumulation of probable cause and also 2) independently verifying the credibility of the confidential informant. The additional investigative activity between December 15 and January 16 consisted of:

1. Verifying that James Todd Hibler, Quentin Maddox's original supplier, had, indeed, been arrested and that Maddox, therefore, had to resort to an alternative source of supply;

2. Ascertaining from the Department of Motor Vehicles that a 1981 Mercedes Benz, with Maryland tags WEA 217, was registered to Maddox;

3. Ascertaining, also from DMV, that a 1987 Nissan truck, with Maryland tags 040 955, was registered to Maddox;

4. Ascertaining that on October 30, 1988, Maddox had been arrested in the aforementioned 1981 Mercedes in possession of both marijuana and a concealed deadly weapon and that he was subsequently convicted on both charges;

5. Ascertaining from the telephone company that the "contact" telephone number furnished to the drug-purchasing informant by Maddox (224–4777) was listed to 290 Cape St. John Road;

6. Calling that number, asking for "Quentin," and hearing a male voice respond that he was "Quentin," indicating that Quentin Maddox was at Cape St. John Road, notwithstanding the fact that Maddox's legal residence was 1162 Bayview Vista;

7. Conducting a surveillance at 290 Cape St. John Road and discovering both Maddox's 1981 Mercedes and his 1987 Nissan truck parked in the driveway, again indicating Maddox's presence at Cape St. John Road, notwithstanding that his legal residence was elsewhere;

8. Ascertaining with respect to 290 Cape St. John Road that the telephone charges were billed to James Douglas, that the gas and electric charges were billed to Tracey Stover, and that the house itself was in yet a third name;

9. Learning that the valuable house, worth "easily in excess of $100,000," was apparently leased to Maddox and to Tracey Stover, notwithstanding the fact that Maddox, upon his earlier arrest in October 1988, described himself as unemployed, with the Cape St. John Road property, moreover, apparently serving as a second residence; and

10. Searching abandoned trash at 290 Cape St. John Road and finding a piece of paper with the phone number 757–4057, tracing that number to a Christopher Paul Woodruff, and discovering that Woodruff had been arrested twice in March 1988 for the possession of PCP.

The primary source for the probable cause directed at Maddox's two vehicles and at the house out of which Maddox apparently operated was, of course, the informant who had regularly purchased marijuana from him. The police were appropriately busy during the month between December 15 and January 16 verifying the credibility of that informant in ten separate and significant regards. A fringe benefit of the verifications, moreover, was that some of them also served as at least modest indicators that the criminal arrangement described by the informant on December 15 had not been dismantled during the days and weeks that followed.

The appellees also argue staleness with respect to the informant's information, looking backward from December 15. They condemn the fact that "the confidential source gave the officer no information as to the time frame of the alleged drug deals with the confidential source." Looking, as all parties must, at the totality of the warrant application, reasonable inferences as to that time frame abound.

Although the informant did not furnish Detective Brown with a logbook of precisely dated entries, the reasonable inference was clear that the informant had been engaged in a regular and ongoing pattern of purchasing large amounts of marijuana from Maddox which followed a repetitive semi-weekly schedule:

"The source of information stated that it would purchase a half pound of Marijuana twice a week from Quentin Maddox. The half pound would usually cost $450.00. The source stated that it would telephone Maddox, request the amount, and meet a short time later. The meetings would usually take place on shopping center parking lots, or at convenience stores. The source stated that Maddox would arrive either in a 1981 Mercedes or a 1987 Nissan truck. The source further stated that Maddox does not like to sell less than half pounds at a time, because he loses money on his investment. The source stated that Maddox was always good for several pounds."

The informant recounted to Detective Brown his knowledge that Maddox's original source of supply had been one James Todd Hibler. The warrant application then pointed out that a series of drug raids on November 2, November 4, and November 7 took James Todd Hibler out of circulation. The further information relayed to Detective Brown by the informant self-evidently related to a time following Hibler's arrest in early November:

"The source stated that when James Todd Hibler was arrested, Quentin Maddox was able to find another source of marijuana that could supply the same amount, if not more, than James Todd Hibler."

The informant's knowledge of Maddox's new source of supply obviously was acquired at a time after the early November drug raids closed off the old source of supply. The reasonable inference is that this continuing contact between the informant and Maddox was an incident of their continuing trafficking in marijuana. Even giving the appellees the benefit of the earliest termination date between Hibler's arrest and December 15, assuming that the trafficking ever terminated at all before that latter date, the last such sale could not have been more than four or five weeks prior to December 15.

Such a time frame makes this case more akin to *Peterson v. State,* 281 Md. 309, 379 A.2d 164 (1977), *cert. denied,* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978), in which information one month old was approved as nonstale, than to *Connelly v. State, supra,* wherein information six months old was condemned as stale. In *Connelly,* 82 Md.App. at 365, 571 A.2d 881, we contrasted the two time periods:

"This Court has upheld a warrant issued on probable cause that was approximately one month old, reasoning that 'the criminal activity was regenerating, the criminal entrenched, and the thing to be seized, while easily transferable, was just as easily replaced. Thus, the probable cause was not stale.' *Peterson,* 281 Md. at 321, 379 A.2d 164, quoting *Peterson v. State,* No. 590, Sept. Term, 1976,

decided 25 Jan. '77, unreported. Evaluations similar to those made in *Peterson* can be made here. But a lapse of one month cannot be equated or even seriously compared to a lapse of, at least facially, six months. The lapse of six months or more between the observation of the facts supporting the warrant and the application for the warrant when considered in the circumstances of this case renders the probable cause stale."

In terms of the tendency of an established pattern of activity to continue unchanged, the earlier conviction of Maddox takes on added probative value. Maddox was still selling drugs in November 1989 from the same 1981 Mercedes in which he possessed drugs a year earlier. He was still dealing with the same drug, marijuana, in November 1989 that he was convicted of possessing a year earlier. On October 30, 1988, he was unemployed. In November 1989, he was enjoying a residential and vehicular affluence not normally afforded the ranks of the unemployed. There arises from this an almost Newtonian law of presumptive continuity: A body of criminality in motion will continue in motion in the same direction unless acted upon by a force. *See State v. Edwards,* 266 Md. 515, 295 A.2d 465 (1972) (reversing a decision of this Court which had held that probable cause was stale); *United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) ("Moreover, these recent purchases were part of a history of purchases over a two-year period.").

That the investigation is of an ongoing criminal activity rather than of a random criminal episode is a significant factor in the probable cause/staleness equation. It was of this we spoke in *Andresen v. State,* 24 Md.App. 128, 172, 331 A.2d 78 (1975), *aff'd, Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976):

"The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the

character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed."

In affirming the decision of this Court on this issue, the Supreme Court observed, 427 U.S. at 478 n. 9, 96 S.Ct. at 2747:

"It is also argued that there was a three-month delay between the completion of the transactions on which the warrants were based, and the ensuing searches, and that this time lapse precluded a determination that there was probable cause to believe that petitioner's offices contained evidence of the crime. This contention is belied by the particular facts of the case."

Probably the leading academic authority on the Fourth Amendment is W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (1978). At 1 *Search and Seizure* § 3.7, at 683–684, Professor LaFave quotes with approval our passage quoted above from *Andresen v. State* and goes on to comment:

"Of the factors identified in *Andresen,* the one which is most frequently relied upon in the appellate decisions is the character of the criminal activity under investigation. 'Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.'" (Footnote omitted).

*See also* J. Hall, *Search and Seizure* 153–154 (1982); *United States v. Johnson*, 461 F.2d 285 (10th Cir.1972); and *People v. Dolgin*, 415 Ill. 434, 114 N.E.2d 389 (1953). *See also Mapp v. Warden*, 531 F.2d 1167 (2d Cir.1976), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976) (probable cause for warrant issued February 13, 1970, where information obtained November 6, 1969, indicated defendant was using premises on a continuing basis as a storehouse for drugs packaged elsewhere).

Applying the *Andresen* rationale to the case at hand, it is clear that Maddox's regular pattern of selling large quantities of drugs was a "regenerating conspiracy" and not a "chance encounter in the night." The ongoing, commercial nature of the enterprise was attested to by the informant's observation that "Maddox does not like to sell less than half pounds at a time, because he loses money on his investment." These are the characteristics of a criminal who is "entrenched" and not "nomadic." Documentary records of a criminal enterprise of this magnitude would be more of "enduring utility to its holder" than something "perishable and easily transferable." The elaborate steps taken to have the property at 290 Cape St. John Road listed in one name, the utilities in a second, and the telephone in a third suggest a "secure operational base" rather than a "mere criminal forum of convenience." The type of crime being investigated was clearly not some random occurrence but a sustained and enduring enterprise.

In *Peterson v. State, supra,* the Court of Appeals was dealing, as in this case, with a conviction for the sale of narcotic drugs. It was dealing, as in this case, with information bearing on probable cause supplied by a confidential informant that was approximately one month old at the time of the warrant application. Judge Orth, speaking for the Court, thoroughly analyzed the law on the subject of staleness. He quoted with full approval from our analysis in *Andresen v. State, supra,* and took it as the benchmark for assessing the evaporation rate of probable cause. Applying that rationale to the warrant application before the

Court in *Peterson*, he agreed with our conclusion in our unreported decision in that case, stating 281 Md. at 321, 379 A.2d 164:

"The Court of Special Appeals thought that 'the criminal activity was regenerating, the criminal entrenched, and the thing to be seized, while easily transferable, was just as easily replaced. Thus, the probable cause was not stale.' *Peterson v. State, supra,* at page 9 of the unreported opinion. We share this view."

The conclusion of the Court of Appeals in *Peterson,* 281 Md. at 321, 379 A.2d 164, aptly sums up our conclusion as to the nonstaleness of the probable cause in this case:

"By its nature, traffic in illegal drugs is ordinarily a regenerating activity, and there was clear indication here that the activity was continual, a course of conduct regularly followed over a protracted time. There was also ample reason to believe from the recitals that Peterson was entrenched in the illicit activity, not only from the information given by confidential informants, but from actual purchases from time to time from him. He followed a persistent pattern of criminal involvement relating to narcotic drugs. It is true that narcotics are easily transferable, but the repeated distributions evident from the facts showed that they were readily replaceable and that Peterson had an available source of supply. It is 'probable' therefore, that Peterson would keep the contraband in his apartment, not as a mere place of convenience, but as a secure operational base."

It does not even require a deferential attitude to affirm the eminently sound conclusion of Judge Lerner, as he issued the warrant, that the probable cause was reliably fresh. *A fortiori,* the warrant would not fail the more deferential standard of review.

### The Prior Criminal Record

The suppression hearing judge totally discounted the significance of the fact that Quentin Maddox had a prior criminal record for the same type of offense just one year

earlier, an offense in which he used the same 1981 Mercedes involved in the current allegations. That part of the warrant application had stated:

"On October 30, 1988 Quentin David Maddox was stopped by the Maryland State Police operating the 1981 Mercedes. Maddox was arrested for possession of marijuana, and possession of [a] concealed deadly weapon. Maddox was subsequently convicted on those charges."

Such information actually served three purposes. 1) By showing the tendency of Maddox to engage in such activity, it contributed directly to probable cause itself. 2) As information independently developed by the police, it also served to corroborate or verify the informant's charges and thereby bolstered his credibility. 3) By showing the ongoing nature of Maddox's involvement with marijuana with the same automobile being implicated, it enhanced, moreover, the likelihood that the criminal activity described by the informant was a continuing one and that the information provided by him was, therefore, less likely to be stale. The suppression hearing judge nonetheless seemed to dismiss this information as totally without significance:

"Then you go back into October of 1988 where Mr. Maddox was stopped by Maryland State Police operating the '81 Mercedes. Well, that backs up the fact he was operating an '81 Mercedes, and was arrested and convicted of possession of Marijuana at that time. But that's certainly not current information."

There is no suggestion in that of any deference, let alone "great deference," to Judge Lerner's apparent decision that the prior criminal record for the same crime did have significance for him.

The case law is far kinder toward the prior criminal record, if not toward the prior criminal. In *Dawson v. State,* 11 Md.App. 694, 708, 276 A.2d 680 (1971), we observed:

"The affiant ascertained that the appellant, less than three years before the current observations, had been arrested and convicted of gambling violations. In inter-

preting otherwise ambiguous conduct, a man's history of criminal activity may well be of probative force. Although, as we observed in *Silbert v. State,* 10 Md.App. 56, 65, [267 A.2d 770 (1970) ] a convicted gambler does not forever after walk through life 'enveloped in probable cause,' he, nevertheless, is burdened by a history that does at least lend interpretative color to otherwise ambiguous activity."

In *Gatewood v. State,* 244 Md. 609, 616, 224 A.2d 677 (1966), Judge Oppenheimer observed, "Knowledge of prior convictions of the person observed is one of the elements to be considered in determining whether there is probable cause." *See also Shrout v. State,* 238 Md. 170, 174, 208 A.2d 585 (1965); *Peterson v. State,* 281 Md. 309, 320, 379 A.2d 164 (1977), *cert. denied,* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978). In *Malcolm v. State,* 314 Md. 221, 232, 550 A.2d 670 (1988), the Court of Appeals reiterated the significance of a prior criminal record, "[T]he fact that the initial suspect, as well as the two men with whom he met, had prior involvement with the exact drug predicted for distribution is no small consideration."

The Supreme Court case law makes it clear that not only prior convictions but also prior arrests and even a criminal reputation may be significant factors in the probable cause equation. In *Brinegar v. United States,* 338 U.S. 160, 162, 69 S.Ct. 1302, 1304, 93 L.Ed. 1879 (1949), *rehearing denied,* 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), probable cause to believe that Brinegar was illegally transporting liquor was based in part upon the fact that five months earlier Brinegar had been arrested for a similar offense and that Brinegar had "a reputation for hauling liquor." In *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a factor in the accumulation of probable cause of bootlegging was the police observation of two of the suspects selling bootleg liquor three months earlier. In *United States v. Harris,* 403 U.S. at 583, 91 S.Ct. at 2081, the Supreme Court described the value of a criminal's reputation in verifying an informant's credibility:

"We cannot conclude that a policeman's knowledge of a suspect's reputation—something that policemen frequently know and a factor that impressed such a 'legal technician' as Mr. Justice Frankfurter—is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely in assessing the reliability of an informant's tip."

The significance of just such a criminal history on the issue of probable cause, especially when it involves the same type of crime, provoked our comment in *Malcolm v. State*, 70 Md.App. 426, 432, 521 A.2d 796 (1987), *affirmed in part, vacated in part on other grounds, Malcolm v. State*, 314 Md. 221, 550 A.2d 670 (1988):

"On the street, if not at the trial table, an individual carries with him inextricably the burden of his reputation (not to mention the burden of the reputation of his passenger)."

Contrary to the suggestion of the suppression hearing judge in this case, a prior criminal record has significance even if a precise date cannot be ascribed to it. In dealing simply with charges at some time "in the past," the Court of Appeals pointed out, in *Birchead v. State*, 317 Md. 691, 703, 566 A.2d 488 (1989):

"That the police confirmed that two of the suspects *had been charged in the past* with possession of a controlled dangerous substance (one with intent to distribute) was a factor to be taken into account in applying the 'totality of the circumstances' formulated in *Gates*." (Emphasis supplied).

### *Tilting at a Windmill*

■ After describing the informant's regular, semi-weekly purchases of large quantities of marijuana from Quentin Maddox, the affidavit devoted four short paragraphs to describing Maddox's ostensible source or sources of supply. That segment of the affidavit began by stating that the informant "knew Maddox purchased large quantities of marijuana from James Todd Hibler." It then went on to

recite the independently developed police knowledge that the police had raided three locations used by Hibler to store and distribute drugs. The three raids took place between November 2 and November 7, and in the course of those five days, Hibler was arrested and effectively put out of the drug-selling business. The recitation then reverted to the informant who "stated that when James Todd Hibler was arrested, Quentin Maddox was able to find another source of marijuana that could supply the same amount, if not more, than James Todd Hibler."

The clear import of those four paragraphs is that the informant was passing on the information he had learned about Maddox's initial source of supply, about the shutting down of that source, and about Maddox's resort to an alternative source of supply. The police recitations about catching Hibler red-handed verified the story told by the informant in two significant regards. It confirmed that prior to the first week in November, Hibler would have been a very bountiful source of supply. It confirmed as well that after the first week of November, Maddox was required to look elsewhere for an alternative source.

The heart of the probable cause directed at Maddox, however, consisted of the regular purchases which the informant made directly from Maddox. The suppression hearing judge seemed to conclude that the probable cause somehow turned upon establishing that Maddox bought his drugs from Hibler rather than that Maddox sold his drugs to the informant. In explaining the suppression ruling, the judge observed:

"I don't know whether he's the person that had some direct contact with the relationship between Mr. Hibler and Mr. Maddox, or whether he had something to do with the transaction that Mr. Maddox is alleged to have made after Mr. Hibler's arrest. There's just nothing in here to indicate what this confidential source of information knew about a direct sale to Maddox.

. . . . .

And the rest of that page is really all Hibler."

The probable cause in this case, of course, arose not from some "sale to Maddox" but from the very different sales *from* Maddox. The utility to this affidavit of the knowledge about the Hibler connection was simply by way of providing corroborative detail. The informant's knowledge about Maddox's sources suggested that the informant was personally familiar with the Maddox operation in significant detail. The independent police verification of what happened to Hibler served as strong corroboration of the informant's reported knowledge so as to reassure the reader that the informant truly knew whereof he spoke.

That this is the reading we place upon the four-paragraph segment is, of course, immaterial. What is material is that it is a permissible reading and inferentially it is the reading that Judge Lerner gave the material. This is all that matters as we and the suppression hearing judge alike are enjoined to give great deference to Judge Lerner's reading.

### Telephone Numbers in the Trash

In stating that there was no "direct support of any illegal drug activity at 290 Cape St. John Road," the suppression hearing judge totally ignored the police search of the abandoned trash at that location. They discovered several pieces of paper with phone numbers written on them. One of those numbers was listed to an individual who had on two occasions within the previous 18 months been arrested for narcotics violations.

Considered in isolation, the telephone numbers in the trash would mean little. They should not, however, be considered in isolation. The search of the trash occurred, by clear inference, sometime after Detective Brown's interview with the informant on December 15. During that post-December 15 period, Quentin Maddox was spending significant time in 290 Cape St. John Road as evidenced by the presence of both of his vehicles at that location and by his answering of the phone at that location. Maddox's

presence at Cape St. John Road took on a more sinister potential, moreover, when it is remembered that he had a residence on Bayview Vista. Combined with Maddox's post-December 15 presence at Cape St. John Road was the informant's direct knowledge that from at least as early as the first week in November, Maddox's regular *modus operandi* was to take his orders for narcotics on the phone listed to 290 Cape St. John Road. The narcotics would then be delivered "a short time later" in either the 1981 Mercedes or the 1987 Nissan truck, both of which were, after December 15, observed parked at 290 Cape St. John Road. With the listing of various names for the utilities, the telephone, and the residence itself plausibly suggesting a countersurveillance device to hamper investigation, and with the reluc-. tance "to sell less than half pounds at a time [lest he] lose money on his investment" suggesting a substantial commercial enterprise, the fair likelihood arose that 290 Cape St. John Road was a narcotics distribution center and that orders for narcotics were regularly telephoned into that center. In that context, telephone numbers in the trash took on a probative quality they might not have possessed in a vacuum chamber.

That probative value was further enhanced when it was discovered that one of those telephone numbers from the trash was listed to a known substance abuser, twice arrested for the possession of narcotics. This precisely parallels the situation in *Malcolm v. State*, 314 Md. 221, 224, 550 A.2d 670 (1988), where the police checked motel phone records which "indicated that the suspects dialed a number which the police then believed belonged to Michael Sideman, a former defendant in a controlled substance case." In cataloging the verifying details that contributed to the finding of probable cause in that case, the Court of Appeals noted, 314 Md. at 232, 550 A.2d 670:

"The tip checked out in every way. In corroborating the tip, the police also observed ... a telephone call to a number believed to be that. of another drug connected party."

*See also Pearson v. State,* 53 Md.App. 217, 229–230, 452 A.2d 1252 (1982) ("[S]ome of these visitors had been involved in CDS violations; a pen register recorded numerous telephone calls from appellant's residence to persons with similar criminal backgrounds.")

When one's social or business contacts, whether in person or by mail or by telephone, have actual or suspected criminal histories, there is, at least at the probable cause plateau, the inevitable phenomenon of suspicion by association. In our *Malcolm v. State,* we observed, 70 Md.App. at 431–432, 521 A.2d 796:

"A persuasive clue, by way of corroborating the tip that Ricky Lewis was involved in preparing PCP, was the cast of characters and their shady histories. Thirty-two Dalmar Street was placed under surveillance. Three individuals were observed leaving that address together.... When three underworld characters, with criminal histories of PCP manufacture and PCP distribution, come together, the tip that PCP activity is afoot takes on credibility."

We spoke of the same inevitable phenomenon—one of *Brinegar*'s "factual and practical considerations of everyday life," 338 U.S. at 175, 69 S.Ct. at 1310—in *Dawson v. State,* 11 Md.App. at 711–712, 276 A.2d 680:

"On one of the days of observation, the appellant was observed in close association during all of the day's activities ... with a William Abdo, who was known by the affiant to have been arrested in 1966 along with the appellant for alleged gambling violations. It is not to permit 'guilt by association' to reason that one's association may, at least, lend interpretative color to otherwise ambiguous activity."

When a suspect, who was convicted of possessing drugs a year ago, is inferentially shown to be in present telephone contact with an individual who was twice arrested for narcotics violations a little more than a year ago, the informant's story that the suspect is presently selling

drugs, after taking orders over the same telephone, is significantly bolstered.

### The Sinister Significance of Innocent Detail

The final observations of the suppression hearing judge, as he ruled the warrant invalid, dismissed as essentially meaningless a full page (single spaced) of various police observations recounted in the warrant application:

> "And then it just really goes off onto things that really don't have any great direct support of any illegal drug activity at 290 Cape St. John Road."

In arguing that the suppression order should be upheld, the appellees disparage these various police observations on the ground that, "the information is readily available to any citizen of this State and certainly would not demonstrate any condition of criminal activity." They make the claim that probable cause is exceedingly difficult to establish absent direct police observation of "overt activity tending to show a criminal enterprise."

The law, however, is quite otherwise. As stated by *Illinois v. Gates*, 462 U.S. at 243 n. 13, 103 S.Ct. at 2335:

> "[I]nnocent behavior frequently will provide the basis for a showing of probable cause.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."

At 1 W. LaFave, *Search and Seizure* § 3.3(f), at 683 (2d ed. 1987), the law in this regard is well summarized:

> "Although it has been suggested that '[o]nly corroboration of an incriminating allegation should be relevant,' this strict view has not prevailed. In *Gates* the Court rejected the lower court's position that 'corroboration of innocent activity' would not suffice, noting that seemingly innocent activity can become suspicious in light of a prior tip. As a general matter, the Court concluded, the 'relevant inquiry' in making a probable cause determina-

tion 'is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.'

Thus, it is not necessary that the events observed by the police supply probable cause by themselves or that they point unequivocally in the direction of guilt. It is sufficient that they are 'unusual and inviting explanation,' though 'as consistent with innocent as with criminal activity.' " (Footnotes omitted).

What must be remembered is that the independent police observations, both by way of verifying the credibility of the informant and by way of contributing directly to the accumulation of probable cause, are not to be viewed alone. Their full significance emerges only when considered in combination with the information passed on by the informant. The value of this ancillary function was described by *Illinois v. Gates*, 462 U.S. at 241, 103 S.Ct. at 2334:

"Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work."

The Court of Appeals, in *Potts v. State*, 300 Md. at 575, 479 A.2d 1335, quoted with approval from *Gates*, " 'Because the informant is right about some things, he is more probably right about other facts.' "

The case that has become the benchmark for independent corroboration of an informant's story is *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). *Gates* refers to it as "the classic case on the value of corroborative efforts of police officials." 462 U.S. at 242, 103 S.Ct. at 2334. In *Draper*, all of the independent police observations were of innocent facts: 1) Draper matched the informant's description, 2) Draper arrived in Denver on a train from Chicago, 3) Draper's attire and luggage matched the description given by the informant, 4) Draper walked rapidly. As *Gates* observed, "[I]t bears noting that all of the corroborating detail established in *Draper* was of entirely innocent activity...." 462 U.S. at 243 n. 13, 103 S.Ct.

at 2335 n. 13. The corroborating detail was held to be enough in *Draper,* and *Draper* has been the benchmark ever since.

In the *Gates* case itself, the Illinois Supreme Court reasoned exactly as do the appellees here. The Illinois court held that the verification of details contained in the anonymous letter in that case amounted only to "the corroboration of innocent activity" and that that was insufficient to support a finding of probable cause. 85 Ill.2d 376, 390, 53 Ill.Dec. 218, 224, 423 N.E.2d 887, 893 (1981). In overturning the Illinois decision, the Supreme Court pointed out that such observations are not to be viewed in a vacuum but in combination with the informant's allegations. " '[I]n this case, just as in *Draper,* seemingly innocent activity became suspicious in light of the initial tip.' " 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13.

The appellees here also enjoyed kindred spirits in the Massachusetts Supreme Judicial Court in what became *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). That court struck down a finding of probable cause for the reason that "each item of corroborative evidence either related to innocent, nonsuspicious conduct or related to an event that took place in public. To sustain the warrant, the court concluded, more substantial corroboration was needed." *Massachusetts v. Upton,* 466 U.S. at 731–732, 104 S.Ct. at 2087. The Supreme Court overturned the Massachusetts court, holding that the police observations, albeit of innocent activity, were sufficient to uphold the warrant. It concluded, "The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause, the court conducted a *de novo* probable cause determination." 466 U.S. at 732–733.

The Supreme Court has analogized the articulable suspicion cases to the probable cause cases in terms of the corroborative value of observations of noncriminal activity.

In *United States v. Sokolow,* 490 U.S. 1, ——, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1, 11 (1989), it observed:

> "Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."

*See also Alabama v. White,* 496 U.S. ——, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990). The *Sokolow* opinion, 490 U.S. at ——, 109 S.Ct. at 1587, 104 L.Ed.2d at 12, pointed out that *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), had "involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.' " 490 U.S. at ——, 109 S.Ct. at 1587, 104 L.Ed.2d at 12. The *Sokolow* opinion also quoted with approval from *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980):

> " '[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.' "

Maryland has regularly followed the lead of the Supreme Court in this regard. In upholding the decision of the magistrate to issue a search warrant in *Birchead v. State, supra,* the Court of Appeals was dealing with a case in which each distinct item of independent police verification consisted of the observation of a noncriminal act. The fault in the appellees' reasoning is that they seek to look at each circumstance individually rather than look at "the totality of the circumstances." The significance of the totality was what we commented upon in *Dawson v. State,* 11 Md.App. at 707–708, 276 A.2d 680:

> "The appellant urges strongly that not one of his observed activities could not easily have been engaged in by an innocent man. That is true. It is also beside the point. What the appellant ignores is that probable cause emerges not from any single constituent activity but, rather, from the overall pattern of activities. Each fragment of conduct may communicate nothing of signifi-

cance, but the broad mosaic portrays a great deal. The whole may, indeed, be greater than the sum of its parts."

It was not deferential at all, let alone greatly so, to dismiss as inconsequential ten items of possible verification that may have been of great consequence to the warrant-issuing judge.

### The Focus on 290 Cape St. John Road

The suppression hearing judge ruled and the appellees strongly argue that the probable cause, although aimed at Quentin Maddox generally, did not focus adequately on 290 Cape St. John Road as the place to be searched. We do not agree.

The most direct and damning information in the warrant application was aimed directly at 290 Cape St. John Road. This was the information from the informant himself, whose credibility was verified again and again and who alleged that he purchased large quantities of marijuana from Quentin Maddox on a regular, semi-weekly basis. The telephone number he would invariably call to place those orders with Maddox was 224–4777. After the calls were made, Maddox would always show up "a short time later" at a designated parking lot of a shopping center or convenience store. Although the informant, to be sure, was not allowed to know where Maddox's telephone was located, the police check with the telephone company revealed that 224–4777 was located at 290 Cape St. John Road. The 1981 Mercedes and the 1987 Nissan truck, moreover, in which the narcotics would be immediately dispatched to the purchase sites, were observed by the police parked at 290 Cape St. John Road. The Cape St. John Road residence was, by every reasonable inference, the very vortex of this trafficking operation.

Independent verification after independent verification then relentlessly maintained the steady focus on 290 Cape St. John Road. We have already alluded to the check with the telephone company, which revealed that the telephone

number to which orders were called in was located at 290 Cape St. John Road, and to the surveillance of 290 Cape St. John Road, which showed that, at the time of the surveillance at least, the delivery vehicles for the ordered narcotics were based there as well. The police verified for themselves that Quentin Maddox was, indeed, operating from 290 Cape St. John Road. They called the number listed for that address, asking for "Quentin." A male voice answered to the request for "Quentin." Additional police checks with the Department of Motor Vehicles confirmed that the known delivery vehicles, observed in the driveway at 290 Cape St. John Road, were registered to Quentin Maddox. The investigative fates of Quentin Maddox and 290 Cape St. John Road were inextricably intertwined.

Once the involvement of Quentin Maddox with 290 Cape St. John Road was established, Maddox's prior criminal record inevitably inured to the detriment of that operational base as well. A suspicious light focusing upon the occupant of a house unavoidably casts rays of suspicion upon the house occupied.

The telephone numbers, including the telephone number of an arrested drug violator, were found in the trash at 290 Cape St. John Road.

The noncriminal but nonetheless unusual dispersal—listing the property in one name, billing the utilities to a second, billing the telephone to a third—of those legal and commercial incidents that ordinarily are helpful in tracing a house to a person, directly involved 290 Cape St. John Road. Whether by accident or design, the trail was harder than usual to follow. This scrambling of tell-tale identifying clues might seem innocuous to a particular judge. It might to some other judge, however, be interpreted as a plausible countersurveillance technique, with all of its sinister implications. One judge's incident of communal living may be another judge's shell game. Whichever significance the warrant-issuing judge chose to give it, the prerogative was his and the *situs* of the significance was indisputably 290 Cape St. John Road.

The focus on 290 Cape St. John Road was clear and unwavering. To be sure, there were no police observations of deliveries being made on the premises, but from the *modus operandi,* one would not expect retail deliveries to be made at a headquarters the location of which was a carefully guarded secret. The informant-purchaser was never permitted to come to 290 Cape St. John Road or even to know its whereabouts. The telephone calls went into that distribution center and the drugs would then be dispatched from that center to a series of floating rendezvous where, if discovered, they would not compromise the operational base.

The very claim made by the appellees in this regard was rejected by the Court of Appeals, in *Peterson v. State,* 281 Md. 309, 321–322, 379 A.2d 164 (1977):

"We do not think that this probability was fatally eroded by the absence of observed activity or informant reports concerning the apartment during the latter stages of the surveillance. On the contrary, the affiant may well have reason to believe that Peterson was carrying on the actual distribution of the drugs away from the apartment to make more secure his use of it to store the drugs."

### Conclusion

Coincidentally, we think Judge Lerner properly issued the warrant and that his decision should not even have needed the "great deference" to which it was entitled. More pertinently, we hold that Judge Lerner had a substantial basis for issuing the warrant and that the reviewing judge, therefore, was legally wrong to have suppressed the evidence.

ORDER OF SUPPRESSION VACATED AND CASES REMANDED FOR TRIAL UPON THE MERITS; COSTS TO BE PAID BY APPELLEES.

MANDATE TO ISSUE FORTHWITH.